# Exhibit A
# Declaration of Laura Geist

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| SUSAN A. PITT, Individually, as Successor-In-Interest to MICHAEL A. PITT, Decedent, on Behalf of the Estate of MICHAEL A. PITT, and on Behalf of the Class,<br><br>        Plaintiff,<br><br>  vs.<br><br>METROPOLITAN TOWER LIFE INSURANCE COMPANY, a Delaware Corporation<br><br>        Defendant. | Case No.: 3:20-cv-00694-BAS-DEB |

December 6, 2021

## Expert Report of Craig Merrill, PhD

**CONFIDENTIAL**

# Table of Contents

I.    Qualifications ................................................................................................................. 2

II.   Assignment ...................................................................................................................... 4

III.  Summary of Opinions ................................................................................................... 5

IV.   Factual Background: Types of Life Insurance ........................................................... 8

V.    The Proposed Class ...................................................................................................... 12

VI.   Factors That Influence Policyholder Termination or Lapse Decisions ................. 13

    A.   A Preliminary Look at the Research Data ........................................................ 14

        1. The Prevalence of Lapsation ........................................................................ 15

        2. The Consequences of End-Of-Term Period Lapsation for the Mortality Experience of the Remaining Block of Policies ............................................ 17

    B.   Determinants of Lapsation in the Academic and Professional Literature ........ 19

VII.  Case-Specific Determinants of the Decision to Lapse ............................................. 22

VIII. The Random Sample of 100 Proposed Class Policies .............................................. 23

    A.   Term Insurance Termination or Lapse Behavior .............................................. 27

        1. Guaranteed Level Term Insurance Termination or Lapse Behavior ............. 27

        2. Other Term Insurance Termination or Lapse Behavior ................................ 35

    B.   Non- Term Insurance Termination or Lapse Behavior ...................................... 40

        1. Policy File Indicates Active Termination ..................................................... 40

        2. Policy File Indicates Active Policy Management Around the Time of Termination or Lapse ................................................................................... 49

        3. Additional Individual Inquiry Required of Policyholders ............................ 60

Confidential

## I.    Qualifications

I am a Professor of Finance at the Marriott School of Business at Brigham Young University and a research fellow of the Wharton Financial Institutions Center. I received my Ph.D. in Insurance and Finance from the Wharton School of the University of Pennsylvania. Courses at the Wharton School were taught by leading scholars in insurance economics and financial economics as well as by distinguished professionals from the industry. I completed the entire sequence of required courses in both the finance major and the insurance and risk management major areas.

By virtue of my positions as Professor and research fellow, I have spent several decades studying consumer financial products, and in particular life insurance and related products. This includes the economic and non-economic reasons for owning, or discontinuing ownership of, life insurance, annuities, and other retirement products. My primary area of academic research and publication is the valuation of interest rate contingent securities with applications to derivative pricing, valuation of insurance liabilities, and asset/liability management for insurers which includes an understanding of consumer decisions as to the products comprising their portfolios.

I coauthored a monograph with Professor David F. Babbel of the Wharton School on financial valuation models that was commissioned and published by the Society of Actuaries and has been required reading in preparation for their certification exams. Some of my academic papers have also been required reading for actuarial certification exams. My academic papers on fair value accounting and liability valuation helped form the theoretical foundation of the American Academy of Actuaries' contribution to developing a fair value accounting system for insurance liabilities. I have also conducted research and published on investment strategy and loss distribution models.

My work includes consumer decision making around the use and management of fixed, indexed, and variable annuities – which are a variation of life insurance and closely related products. Annuities are insurance products that are designed to be converted into lifetime annuity payments upon retirement or at other relevant times (potentially well into retirement years, as a relevant supplemental source of lifetime income). Basic lifetime annuity payments stop with the death of the policyholder while life insurance payouts start with the death of the insured but they overlap as life insurance products. I have studied these products from the perspective of issuing firms as well as from the perspective of consumers' portfolio decisions.

Confidential

My consulting assignments (including for Goldman Sachs, AIG, Swiss Re, Lazard Frères, The Hartford, New York Life, World Trade Center Properties, and others) have involved such projects as: two-factor and three-factor bond pricing models; multi-asset return simulation models; compiling a database of intraday Treasury security prices constructed from the GovPX data feeds; development of international interest-rate and exchange-rate simulation models; and an assessment of liability valuation, asset adequacy, and risk for variable annuity products. I have also presented professional seminars on financial pricing of insurance liabilities, risk management, asset/liability management, and mathematical finance. Valuation and risk assessment of financial contracts that include consumer contingencies requires in-depth study and understanding of consumer financial decisions and the economic and other reasons why individuals may choose to purchase, hold, sell or otherwise dispose of, or discontinue insurance products such as life insurance, annuities and other retirement or wealth management vehicles.

At BYU Marriott, I teach courses on fixed income securities and derivatives in the undergraduate and MBA programs. In these courses, I teach the valuation tools that are used in valuation and risk assessment for insurance liabilities. I have also taught many executive education courses at the Wharton School, as well as courses for Citibank Latin America and other companies in Europe on advanced asset/liability management for insurers. These courses were for chief actuarial officers, partners at accounting firms, actuaries, and other investments professionals. Attendees have represented business interests in at least 30 countries around the world.

All of these research and teaching activities and those described on my curriculum vitae (Exhibit 1) rely upon a foundation of financial and economic theory, as well as industry practice, including, relevant to this case, the life insurance industry. My publication record in quality academic journals includes many articles that are motivated by questions, issues, or data that arose from consulting activities (all publications are listed in my curriculum vitae). For example, I published an article with Professor Babbel in the Journal of Risk and Insurance that explores common mistakes that have created trouble for insurance companies. My experience working with successful insurance companies provided a good perspective on insurance company management and decision making to make comparisons about common mistakes. This type of exposure qualifies me to comment on insurance company practice and the impact of consumer decision-making, informed by financial and economic theory.

3

**Confidential**

In addition to my current curriculum vitae, a listing of all other cases in which I testified as an expert at trial or by deposition for the past 4 years is attached as Exhibit 2. My compensation arrangement is to be paid my standard rate of $850 per hour. Any compensation I have received or will receive in connection with my work on this case is in no way contingent on the outcome of any matter. Charles River Associates, an international financial and economics consulting company, has provided research support for my work.

A listing of the materials I have considered in forming my opinions in connection with this assignment is contained in Exhibit 3 of this report. Information specifically informing particular statements are in the citations in the footnotes of this report. While I cite a number of documents as support for statements in this report, my opinions are based upon my professional experience as a professor, researcher, consultant, and testifying expert over the past 25 years, including experience serving as a testifying expert in cases involving insurance retirement products.

My work is ongoing, and I reserve the right to modify or expand upon my opinions should additional relevant information become available or brought to my attention after the date of this report.

## II.   Assignment

I have been asked by counsel for the Defendant in this litigation, Metropolitan Tower Life Insurance Company ("Tower"), to provide this report in response to Plaintiff's Motion for Class Certification to help the court understand and assess the individualized circumstances that lead to the termination of life insurance policies. In addition, I have been asked to opine on how, whether, why, and when policyholders choose to allow their life insurance policies to end. This includes a review of the possibilities that they would end coverage by failing to pay premiums that are due, including an assessment of assumptions that either can or cannot be made across various populations of policyholders. Finally, I have been asked to opine on how policyholder behavior impacted the termination and "lapse" of the policies within the putative class in this case.

My opinions in this report are based on my specialized knowledge arising from my education, training, study, and experience. These opinions are supported by academic and professional research related to policyholder decision-making, and specifically decision-making

4

Confidential

related to policy termination, as well as information regarding the population of policies that I understand Plaintiff asserts are part of the proposed class. I also present an analysis of the specific policy files from a random sample of 100 Tower policies within the proposed class, reviewed to determine whether the range of behaviors displayed by Tower's policyholders are consistent with what is described by research.

## III.    Summary of Opinions

As set forth in further detail below, my opinions in this case, based on experience and analysis, can be summarized as follows:

A.    Plaintiff's proposed class definition reflects a fundamental flaw in that it treats "lapse" and "termination" as if the decision to end coverage was not intentional. Policyholders can, and often do, deliberately determine that they do not want to keep an insurance policy, and affirmatively elect to terminate it. They can do so by surrendering the contract or withdrawing all value from the policy (if it is UL or VUL), or simply by stopping payment of premiums that are due. This is not the same thing as a "lapse," even though both result in the policy no longer staying in force, the reasons and circumstances vary and often cannot be known without close examination.

B.    Whether or not a policy termination was potentially harmful to a class member is a highly individualized question that cannot be presumed across a proposed class. After all, the termination may have been an entirely desired, planned and purposeful choice by the policyholder. The reasons for the occurrence of policy termination or lapse within the class proposed by Plaintiff require individual exploration and inquiry, often beyond the review of available policy records. This is so because the decision by a policyholder to terminate a policy or let a life insurance policy lapse is an individualized decision based on many factors that interact in complex and hard to predict ways.

C.    Plaintiff's argument that policyholders in the proposed classes were harmed by Tower appears to be based on the assumption that each policy in the proposed class terminated uniformly because of the timing of lapse notifications sent by Tower; or the lack of an opportunity to designate an additional individual to receive such notice. Plaintiff ignores the fact that policyholders often choose to terminate their insurance coverage and that a policyholder's decision to purposefully terminate a policy is routinely determined by factors unrelated to receipt

5

of a grace period letter or lapse notification. In other words, even a failure to give proper lapse notification may be completely harmless if the termination is the result of a policyholder's individual decision to cease purchasing coverage.

1. There is a stream of research in both academic and professional literature that focuses on understanding and modeling policyholder termination and lapse behavior. Ignoring the well-established reasons that termination behavior may have been determined by factors unrelated to Tower's delivery of lapse notifications runs counter to basic economic principles described in this literature.

2. Extensive academic research on policyholder behavior in life insurance reflects the "extreme prevalence" of lapsation and the key reasons that policyholders may lapse coverage. This includes, importantly, dramatic numbers of so-called "lapses" of term life insurance policies during the last year of a level term premium period as policyholders choose not to pay the higher premiums during the post-level term period. (Those higher premiums are a feature of the product and specifically disclosed in the policy.)

3. Notably, notice or grace period factors are not identified in the academic research as a significant contributor to policyholder lapse behavior. In fact, in one study I describe below, over 75% of policy lapses were directly assignable to personal circumstances.

4. It simply cannot be assumed that the termination of a life insurance policy and, in particular, a termination at the end of a guaranteed level term period when premiums may escalate as much as 1,000 percent, is a "lapse" that has any relationship to the timing of notices or grace periods. Rather, such terminations are most likely an economically rational decision made deliberately by a policyholder to discontinue their coverage.

D. I randomly selected 100 Tower policies that are drawn from the purported class in this case in order to gather evidence of reasons for policy lapses. My detailed review of the policies, policy records, and correspondence between policyholders and the company, illustrate the range of behaviors displayed by Tower's policyholders whose policies lapsed. Their behaviors are consistent with the literature on the subject.

Confidential

1.      For example, of the 45 term policies in the sample, 40 were Guaranteed Level Term ("GLT") for either a 10- or 20-year period. At the end of the level term period, the premiums on a GLT policy increase substantially. Of these 40 GLT policies, 33 remained in force for the exact length of the respective level term period as illustrated in Exhibit 4. Across these 33 policies, the premiums were scheduled to increase by greater than 1,000% on average. Not surprisingly, *the vast majority of GLT policies in the sample were terminated at the exact end of the GLT period*. Given the scheduled increase in premiums, it makes economic sense that the policyholders would make the decision, likely at the time of purchase when the premium schedule was set, to discontinue these policies at the end of the level term period.

2.      Among the 55 non-term policies in the sample, the majority reflect either deliberate decisions to terminate, or active management by the policyholder. For eight Universal Life policies the policyholder either called Tower to discuss a pending lapse notice or actively indicated an intention to terminate the policy or let it lapse. For twenty others, the files reflect active management of the policy by the policyholder around the time of lapse including calls to Tower to discuss their life insurance coverage or seeking to draw maximum loans to take out all the cash value accumulated in the policy. For a number of other policies, there is no indication of the reasons for lapse, nor can anything be inferred from that, particularly given that for some of these policies reinstatement had been pursued following previous lapses. Individual inquiry would be required to determine the factual circumstances.

E.      At a minimum, each policyholder is potentially impacted in different ways, if at all, by notice and grace period provisions like those set forth in the statutes. For some policyholders, differing notice and grace periods may have had an impact on policy termination, but that is not certain. Individual review of policyholders' insurance policies, and knowledge and intentions (as reflected in their communications with Tower), are required to determine whether any policyholders within the putative class were—or could be—adversely impacted by the failure to provide the notice and grace periods Plaintiff alleges in her Complaint. And, the required individual inquiry, in many cases, cannot be determined by examination of the policy file.

Confidential

F.    The opinions above, as explained further below, are supported by professional and academic research as well as by specific information located within a random sample of policy files of members of the proposed class. This body of evidence plainly refutes Plaintiff's theory.

I reserve the right to supplement or update these opinions if new information becomes available.

## IV.    Factual Background: Types of Life Insurance

Some of my opinions assume a basic understanding of the types of life insurance at issue in this case. There are several general types of life insurance with numerous variations available within each general type. The selection of a particular type of life insurance is dependent on the reasons an individual may wish to have insurance. Life insurance policies are individualized, flexible, changing, and highly contingent financial products. There are numerous and varying reasons why an individual may purchase life insurance, among which are:

- To provide income to beneficiaries in the event of untimely death of a family member and associated loss of income or any costs that may arise. This protection provides a beneficiary with funds to pay off debts (e.g., a mortgage or funeral expenses) as well as provide funds for future expenses of those who remain (e.g., general living expenses, college, medical, etc.).

- To provide a portion of retirement income. Certain types of life insurance policies allow for a tax-deferred "inside buildup" of cash value over the years prior to retirement, which can be accessed through periodic withdrawals, a policy loan, or an annuity exchange program. This inside buildup is also available and used to help pre-fund and thereby reduce the net amounts that otherwise would be needed later to pay for insurance as the insured grows older. This motivation can be combined with the income protection motivation mentioned above to promote the use of cash value policies over term policies. The life insurance policy, in this situation, changes its character over the years from one of income protection for the spouse and family or other beneficiaries to a source and form of retirement income, while providing mortality risk protection along the way.

- To pay estate taxes. Properly designed and implemented, an insurance policy can be used as part of an estate planning process, most often to provide liquidity for the estate upon the death of the insured to settle costs and taxes.

- To help offset expenses associated with replacing a key executive at a firm should that executive die.

- To facilitate the implementation of other financial contracts.

Confidential

**Term life insurance** is the simplest kind of policy. In this contract, a policyholder pays a fixed premium amount to an insurance carrier for coverage on the life of an insured, up to a pre-specified period of time, or "term" — typically ten or twenty years, depending on policyholder choice. If the policyholder pays required premiums during the term and the insured is still alive after the expiration of the term of coverage selected, the contract ends:  the policyholder receives no additional value and the beneficiaries are not entitled to a payment from the insurance company.[1] Economically, a term life policy has only one function: in exchange for a fixed price, to pay a specific lump sum death benefit to whomever the policyholder has designated, upon the insured's death within a set coverage period. There is no build-up of asset value within the policy for the policyholder (no cash value build-up). The death benefit and the policy limit are the same—a $200,000 policy pays a $200,000 death benefit. The contract can be terminated by the policyholder at any time for many reasons, without cost or penalty, by giving notice or simply by discontinuing premium payments at the discretion of the policyholder.

Certain offerings of term life insurance, including some of the policy types in Plaintiff's proposed class, offer the policyholder the option to continue insurance coverage beyond the term period but for a dramatically increased cost. The cost increases because the insured is now older, and the annual mortality cost is significantly higher, than what was reflected in the original term premium level. Many of Tower's term insurance policies include a level term premium amount for a fixed number of years and then do allow the policyholder to continue the policy at the end of the term period subject to an escalating premium schedule. The premium levels beyond the term period are provided to the policyholder in the contract at the time of issue and typically show dramatic increases in premium level, sometimes as high as 1,000 times the prior level premium, due to the increased risk. Term life insurance is thus purchased by individuals who plan to keep the policy for only the specified level premium period. It is designed to be a temporary product and generally not for individuals wanting to continue life insurance coverage up to death at an older age. It does, however, provide some protection against future uninsurability should a permanent policy be desired later in life.

---

[1] "If the insured survives this period the contract expires and there are no future benefit rights." Anthony M. Santomero and David F. Babbel, *Financial Markets, Instruments & Institutions, 2nd Ed.*, McGraw-Hill Irwin, 2001, p. 567.

**Confidential**

**Whole life insurance** is a product designed to accommodate the demand for life insurance coverage into old age. A whole life insurance policy requires periodic level policyholder premiums beginning at the inception of coverage and typically continuing until the death of the insured, or the cancellation and/or surrender of the policy.

Policyholders have a specified level premium amount that is paid on a periodic basis (monthly or annually) through the entire period of coverage. From the viewpoint of the policyholders, whole life policies are simple: pay a specified constant premium from inception up to the time of death and the beneficiaries receive a specified death benefit. Whole life policies build up cash value with a minimum interest rate and frequently dividends paid by the insurer. There are relatively few options available to policyholders under a whole life policy and the policyholders face relatively few risks. Whole life insurance is, however, the highest annual premium type of insurance at the time of purchase.

People who no longer want or need insurance, have taken care of expenses or contingencies in other ways, or choose to spend the premium dollars in a different way, can either stop paying premiums and use the cash value to cover premiums for however long that may last or can surrender their policies and receive any cash value. These same factors may apply to other forms of life insurance, as well.

**Universal life and variable universal life insurance** are products that require premiums and provide both a death benefit and a cash value component, but in a more flexible way for both policyholder and insurer compared to whole life policies.

The hallmark of universal life products is that each policy can be used in a flexible manner to meet the specific needs and goals of each policyholder. Policyholders determine, for example, when and how much premium to pay, depending on their objectives and subject to required minimums.

The contracts generally work as follows:  Premium dollars are paid into a contract fund, which is credited interest. Sufficient premium must be paid so that cash accumulated in that contract fund exceeds monthly deductions taken by the company. Monthly deductions primarily consist of current cost of insurance charges, plus other required charges (e.g., for taxes, sales and administrative costs). Cost of insurance charges increase as an insured ages but are subject to maximum rates set forth in each contract.

Confidential

For a policy to remain in force, the amount in the contract fund must be sufficient to exceed the monthly deductions. This may or may not require that a policyholder pay premium payments at regular intervals. For example, a policyholder could choose to pay premium on a regular basis, or could pay only the minimum amount due—or alternatively, could deposit significant premium in early contract year/s to allow the cash value to build and cover monthly deductions. If at any time the contract value is not sufficient, notice is provided which indicates the amount the policyholder must pay for the contract to continue in force.

Policyholders can, at any given time, choose to build up their policies' cash value and thus reduce monthly cost of insurance deductions by decreasing the amount at risk; or alternatively, they can pay only the minimum amount necessary at any time to keep their contract in force and have no cash value, much like a term policy. Policyholders may also choose to access any built-up cash value in their contracts by taking loans or making withdrawals, and use the money however they choose. The policies are purposefully designed with this flexibility, enabling each individual to tailor his/her policy to their current needs. This includes the right to terminate at any point in time, at the policyholder's discretion. Since the cost of insurance escalates over time, policyholders who have chosen not to build up their cash value early in the life of their contracts may (and often do) choose to terminate these policies as they age due to the expense of maintaining coverage.

Universal Life ("UL") insurance provides cash value growth in the form of an interest rate methodology set by the insurer while Variable Universal Life insurance provides cash value growth with investment options that have exposure to financial markets. I will refer to both types of polices as UL for the purposes of this report.

In terms of risk, the variable universal life policyholders retain significant exposure to capital market conditions. Low returns or yields in the capital markets, or funding at only the minimum amounts without cash build up, may lead to an increased need to pay premiums in later years as cost of insurance climbs. Thus, UL policies fall somewhere in between term life and whole life in the amount of risk retained by the insured or assumed by the insurer

Like other policy types, of course, a policyholder can actively terminate a policy or purposefully let it lapse by not paying the required premiums.

Confidential

### V.      The Proposed Class

In this case, Plaintiff has proposed to certify the following class:

All owners, or beneficiaries upon a death of the insured, of [Tower's] individual life insurance policies that were renewed, issued, or delivered by [Tower] in California, and in force on or after January 1, 2013, and which [Tower] lapsed or terminated for the non-payment of premium without [Tower] first providing all the notices, grace periods, and offers of designation required by Insurance Code Sections 10113.71 and 10113.72.[2]

One key problem with this definition is that it treats "lapse" and "termination" as if the decision to end coverage was not intentional. In fact, a policyholder may choose to instigate a "lapse" or "termination" of a policy. When a policyholder makes the choice to end coverage, any notice from the insurer is merely an acknowledgement of the policyholder's choice. It is only in the case where a policyholder is surprised by a notice of lapse that any possibility of harm may exist. It is only a possibility because, even then, a policyholder can deliberately determine that they do not want to keep an insurance policy, and affirmatively elect to terminate it. They can do so by surrendering the contract, withdrawing all value from the policy (if it is UL or VUL), or simply stopping payment of premiums that are due. This is not the same thing as a "lapse" that is due to a policyholder's failure to pay premium or monitor policy account value even though both result in the policy no longer staying in force. What this definition fails to address is the "why" instead only focusing on the "result."

I understand that Tower has produced information to Plaintiff related to this proposed class that encompasses all life insurance policies of Tower and General American that were in force as of January 1, 2013, were issued in California, or where the policyholder's current mailing address is California or was in California at the time the policy terminated.

Based on the proposed broad class definition, the data produced by Tower includes 5,041 policies that are no longer in force and 239 are "Lapse Pending."[3] The terminated and lapse pending policies are summarized in Table 1, below. The non-term policies include universal life, variable universal life and whole life policies with the majority consisting of universal life.

---

[2] Plaintiff Susan A. Pitt's Notice of Motion and Motion for Class Certification, October 21, 2021, p. 3.

[3] Exhibit A to Tower's 's Second Supplemental Responses and Objections to Plaintiff's Interrogatories, [Set Two], July 9, 2021.

Confidential

| Table 1 | | |
| --- | --- | --- |
| **Proposed Class By Policy Type**[4] | | |
| Term | 2,338 | 44% |
| Non-Term | 2,942 | 56% |
| Total | 5,280 | 100% |

Whether a policy termination was potentially harmful to a class member, or instead an entirely desired, planned and purposeful outcome, is an individualized question that cannot be presumed across the proposed class. The reasons for the occurrence of policy termination or lapse within the class proposed by Plaintiff require individual exploration and inquiry, including in many cases an inquiry outside the policy records maintained by Tower. This is so because the decision by a policyholder to terminate a policy or let a life insurance policy lapse is a decision based on many factors, often known only to them, that interact in complex and hard to predict ways.

## VI.   Factors That Influence Policyholder Termination or Lapse Decisions

As noted above, Plaintiff's theory that all insurance policy terminations are inadvertent lapses that occurred because of the timing of proper notification sent by Tower is not something that can be determined on a class-wide basis. It is my opinion that the decision to terminate or let an insurance policy lapse is largely driven by the personal circumstances of an individual policyholder. My opinion is supported by professional and academic research as well as information found within a sample of Tower's policy files. This body of evidence plainly refutes Plaintiff's theory.

As I explain in this section and in Section VIII below, the professional research and policy files provide ample evidence to refute Plaintiff's theory. But even so, individualized inquiry would still be required beyond the information in the policy file for many policyholders. As the analysis of the random sample discussed in Section VIII below indicates, there are specific determinants of policy termination that are beyond those general reasons considered by the academic literature and are not immediately visible in the policy file. For example, the health

---

[4] Exhibit A to Tower's 's Second Supplemental Responses and Objections to Plaintiff's Interrogatories, [Set Two], July 9, 2021.

Confidential

status or financial standing of an individual policyholder in the last year of a level term period is a personal circumstance that is only known by the policyholder and may never be communicated to the insurer. The existence of this sort of asymmetric information, in the possession of the policyholder, would imply the need of an individualized inquiry to truly understand the basis for a specific policy termination.

As I understand it, Plaintiff argues that policyholders in the proposed classes were uniformly harmed by an alleged problem with the lapse notifications sent by Tower. In order to establish uniform harm, Plaintiff would need to establish that every policy lapse or termination was (a) unintentional; and (b) caused by notification failures. This is not going to be possible given the well-established other reasons that a policyholder may deliberately choose to terminate or lapse their policy. Plaintiff ignores the fact that the policyholders' decision to purposefully terminate an insurance policy is routinely determined by factors unrelated to the timing of the receipt of a grace period letter or lapse notification.

Ignoring the possibility that termination behavior may have been determined by factors unrelated to Tower's delivery of lapse notifications runs counter to the large academic and professional literature that focuses on understanding and modeling policyholder termination and lapse behavior.

## A.  A Preliminary Look at the Research Data

Two papers on policyholder behavior in life insurance (Bauer et al, 2015, and Eling and Kochanski, 2012), survey the academic literature on modeling and statistical analysis of policyholder behavior, including lapse behavior. They report upwards of 50 papers published since 2000 dealing with lapses for life insurance. Bauer et al (2015), appropriately refer to the "extreme prevalence" of lapsation in the life insurance industry.[5] Additionally, two recent empirical studies on the characteristics and determinants of lapsation in term life insurance in the

---

[5] The paper by Bauer et al, 2015, starts their discussion of the empirical evidence with these words: "Lapsation and surrender are extremely prevalent in conventional term and whole life policies." See Bauer, Daniel; Gao, Jin; Moenig, Thorsten; Ulm, Eric R.; and Zhu, Nan, "Policyholder Exercise Behavior in Life Insurance: The State of Affairs" (2015). Risk Management and Insurance Faculty Publications. Paper 1, page 12. Accessible at http://scholarworks.gsu.edu/rmi_facpub/1.

**Confidential**

US provide abundant evidence of the determinants of lapsation.[6] Notably, notice or grace period factors are not identified as a major contributor to policyholder lapse behavior. I'll expand on these results in more detail in the remainder of this Section, but first I present a graphic summary of how prevalent lapsation is and the mortality consequences of lapsation for the remaining block of policies.

### 1.   The Prevalence of Lapsation

The study by Qian, Johnson, and Jin (2020), is based on a data set including 4 million policies in 25 insurance companies over the years 2007-2015, amounting to "about 18 million annual policy-year records." Their Figure 1A charts the number of records by policy duration for 10- and 15-year level term policies and demonstrates that "[t]he vast majority of the records occur during the level premium period, as many policies lapse before the post-level premium period begins. Most of these lapses occur during the last year of the level premium period as policyholders try to avoid paying the higher premiums during the post-level premium period."



Source: Qian, Johnson, and Jin (2020), page 5.

The more recent study by Bradfield, Covington, Reppert, and Tomas (May 2021) documents a very similar phenomenon with 10-, 15-, and 20-year level term policies, including

---

[6] Ken Qian, Ben Johnson, and Jenny Jin, MIMSA III 2020: Study of mortality and lapse rates in level term life insurance, Milliman Research Report, 2020. Aisling Bradfield, Carolyn Covington, Rebecca Reppert, and Julien Tomas, U.S. Post-Level Term Lapse & Mortality Experience, Society of Actuaries, May 2021.

Confidential

annual records from 25 insurers over the period January 1, 2000 to December 31, 2017. As in the study by Qian et al, both lapse and death claims records are analyzed since health status is an important determinant of lapse behavior. Policyholders have private information about the insured's health status and may make lapse decisions based upon their private knowledge that an insured may be more or less likely to die. If this is the case, then mortality in the years immediately following the end of the term coverage period should increase.

The dramatic drop, caused by lapsations, in policy records documented in the study by Qian, Johnson, and Jin (2020), summarized in their Figure 1A, which I have reproduced above, is similarly documented by Bradfield, Covington, Reppert, and Tomas (May 2021), in terms of lapse rates for term policies by year, surrounding the last year in the level term period ("PLT Duration" 0 in Tables 3.6-2 and 3.6-3 of Bradfield et al). Their Figure 3.4-1, for 10-year level term policies with a non-graded, or annual renewal term (ART), scale (the large majority of term policies in their database), shows that the 6% - 7% lapse rate observed in their data for years prior to the last in the term period jumps to around 60% in the last year of the term period and continues to be at significantly larger levels (around 35% during the first year of the PLT) , eventually settling around 10% within a few PLT years. This pattern, and the related increase in mortality claims following the end of the term period, can also be observed in the records for 15-year and 2-year term periods studied by Bradfield, Covington, Reppert, and Tomas (May 2021).[7]

---

[7] See Tables 3.6-2 and 3.6-3 in Aisling Bradfield, Carolyn Covington, Rebecca Reppert, and Julien Tomas, U.S. Post-Level Term Lapse & Mortality Experience, Society of Actuaries, May 2021, page 18.

Confidential

**Figure 3.4-1**

LAPSE EXPERIENCE BY DURATION – T10 ONLY, JUMP TO ART



## 2.  The Consequences of End-Of-Term Period Lapsation for the Mortality Experience of the Remaining Block of Policies

One of the clear insights of the data used in the studies by Qian et al (2020) and by Bradfield et al (May 2021), is the contrast between lapses during the last duration of the level term period and subsequent incidence of death claims. This is an appropriate example of the importance of the existence of different (that is, asymmetric) information between the two parties in a contract, a life insurance policy in this case. The data consistently show that actual death claims, relative to expected claims increase significantly with the onset of the PLT and remain so over the subsequent years. Figure 3.5-1 in the study by Bradfield et al (May 2021), reproduced below, shows a more than doubling of the mortality exposure for the 10-year jump to ART policies. Simply put, if a policyholder knows the insured is in poor health and has a high risk of dying, they are more likely to pay the premiums to keep the policy in force.

17

**Confidential**

**Figure 3.5-1**

MORTALITY DETERIORATION BY DURATION, T10 ONLY AND JUMP TO ART



The evidence I have just presented sets the stage for a discussion of the motives that policyholders have to let their policies terminate or lapse. While some of these specific determinants of termination behavior are confidential and not part of the policy records that the studies I have mentioned rely on, and cannot be uncovered without individual inquiry, the results in these studies provide evidence consistent with such confidential determinants. Before I describe the various determinants of termination or lapse behavior, I focus on an example of the role that confidential information plays in driving such termination or lapse behavior.

As I have explained at the outset in this section, the health status of an insured in a level term policy approaching the last year of the term period, is an example of "asymmetric information," meaning that the insured knows a lot more about his or her health than the insurance company knows. The underwriting process is meant to eliminate this information asymmetry before the policy is issued but, as the years go by, the insured tends to be better informed than the insurer. Naturally, life insurance companies have aggregate data on the extent of this asymmetry and manage it accordingly using "select" and "ultimate" mortality rates in the pricing of their policies. Still, at the policyholder level, the insured has information about his or her health that the company does not have.

Figures 3.4-1 and 3.5-1 in the study of Bradfield et al (May 2021) illustrate dramatically the relevance of this asymmetry: during the last year in the level term period, insureds whose

**Confidential**

health status is better will tend to terminate or let their policies lapse and insureds with worse health status will tend to keep their policies, even if their renewal premiums increase significantly. The insurance company does observe the consequences of such policyholder behavior under asymmetric information, but only with a delay of one or more years.

### B.  Determinants of Lapsation in the Academic and Professional Literature

The literature has identified various hypothesis for policyholders' decision to let a policy lapse: the "interest rate" hypothesis (more lapses when market interest rates are higher than policy rates), the "policy replacement" hypothesis, related but not equal to the interest rate hypothesis (lapses occur when policyholders decide to purchase another policy), and the "emergency funds" hypothesis (lapses due to preference to use funds for other purposes, wanting or needing to use money for something else). All of these hypotheses have found support in empirical studies, with more evidence in favor of the emergency fund hypothesis. Additional breakdowns of these hypothesis into subcategories such as age, income level, health status, etc., are used in models that combine a cross section of policyholder observations through time (referred to as a panel dataset) in order to obtain a more disaggregated explanation of the factors that determine lapse behavior. In this section, I discuss a set of research papers that consider the determinants of life insurance lapsation.

A carefully designed study (Fang and Kung, 2012) following a cohort of policyholders for several years finds that lapsation in younger policyholders is largely driven by individual-specific factors unrelated to income, health, or bequest motives and that as policyholders age income and health shocks are replaced by the bequest motive.[8]

Some papers address the issue of how product characteristics determines lapsation. This is a developing area of study, nevertheless, the available evidence suggests that, in addition to the explanatory factors described above, product type and duration of policy have an impact on the policyholder's deliberate decision to terminate a life insurance policy or to let it lapse.

The professional literature includes surveys among insurers and policyholders designed to understand current practices and policyholder decisions. More recently, studies based on

---

[8] Hanming Fang and Edward Kung, *Why Do Life Insurance Policy Holders Lapse? The Roles of Income, Health and Bequest Motive Shocks*, NBER Working Paper Series, Working Paper 17899, March 2012.

**Confidential**

extensive policy records, some of them sponsored by the Society of Actuaries (SOA), have included modeling analyses of observed policy lapses (and death claim incidence following lapse) for level term life insurance policies.

In 2015, Deloitte surveyed and analyzed more than 1700 middle market buyers and non-buyers of life insurance in the US. Deloitte found the following distribution of reasons for policy lapse:[9]

| Reason | % Cited |
|---|---|
| Change in Financial Position | 27.7% |
| Other | 24.9% |
| Did Not Want to Pay | 16.9% |
| Lost Job | 10.1% |
| Job Started Offering It | 9.3% |

Stated otherwise, over 75% of policy lapses are directly assignable to personal circumstances other than the timing of notice.

In addition, the decision to lapse a term insurance policy around the end of the term period has been studied in a number of recent papers and research studies. I discuss three very recent studies in this area.

The Society of Actuaries and LIMRA jointly sponsored a 2019 study of persistency and lapse behavior in the US life insurance industry, based on data between 2009 and 2013. In the section devoted to term life insurance lapsation (pages 40 – 63), the authors discuss the prevalence of lapses around the end of the term period, with lapse rates ranging from 59% to 86% in the last year of the term period and the first post-term year.[10] Also specific to term life insurance, the April 2020 Milliman Report by Qian, Johnson, and Jin to which we have referred above found that "lapse rates generally decrease by duration during the level premium and post-level premium periods, but spike significantly during the last duration [year] of the level

---

[9] Deloitte, "Life insurance consumer purchase behavior, Tailoring consumer engagement for today's middle market," September 2015, p. 10.

[10] Maureen Shaughnessy and Kevin Tewksbury, *U.S. Individual Life Insurance Persistency*, A Joint Study Sponsored by the Society of Actuaries and LIMRA, 2019.

Confidential

premium period and first duration of the post-level premium period."[11] The study also noted that lapse rates decrease with an increasing face amount; lapse rates are lower for policies that are automatically funded through bank accounts or credit cards; and lapse rates are higher for less healthy risk classes.[12]

The May 2021 SOA study I have discussed above, by Bradfield, Covington, Reppert, and Tomas (May 2021) provides a systematic analysis of the determinant of lapses and death claims in 10- and 15-year level term policies. The results found that, during the last year of the level term period "shock lapses ranged from 27% to 96% for Jump to ART [Annual Renewable Term] and from 31% to 80% for Graded."[13] The authors also find that lapse rates during the first years of post-level term (PLT) period are quite significant, as their Figure 3.4-1, which I reproduce above, clearly demonstrates. These findings strongly suggest that the vast majority of people who purchased level term policies did so intending to keep the policies for no longer than the level term period (and possibly give them up sooner depending on personal circumstances).

One interesting insight of the research conducted by Bradfield, Covington, Reppert, and Tomas (May 2021) is the extent to which experienced mortality increases immediately following the end of the level term period, illustrating the considerable amount of asymmetric information that builds up from the moment a term policy is underwritten up through the last year of the level term period. Insureds with worse health are more likely to keep their policies in force by renewing at higher post-term premiums, as evidenced by the significant increase in death claim rates that take place in the first years of the PLT. Figure 3.5-1 in the study by Bradfield, Covington, Reppert, and Tomas (May 2021), which I have reproduced above, shows that the "mortality deterioration" during the first PLT year jumps to more than 240% from the approximately 100% of actual relative to expected death claims observed during the last few years of the level term period and remains very high over the few subsequent years.

Bradfield, Covington, Reppert, and Tomas (May 2021) find a number of other factors that play an even more important role in the decision to terminate or let lapse a term policy.

---

[11] Ken Qian, Ben Johnson, and Jenny Jin, MIMSA III 2020: Study of mortality and lapse rates in level term life insurance, Milliman Research Report, 2020, p. 2.

[12] Ken Qian, Ben Johnson, and Jenny Jin, MIMSA III 2020: Study of mortality and lapse rates in level term life insurance, Milliman Research Report, 2020, p. 2.

[13] Aisling Bradfield, Carolyn Covington, Rebecca Reppert, and Julien Tomas, U.S. Post-Level Term Lapse & Mortality Experience, Society of Actuaries, May 2021, p. 6.

Confidential

These factors are, in order of decreasing importance, the size of the premium jump (lapse rate increases with the size), the attained age of the insured (lapse rate increases with attained age), the premium mode (annual billing are associated with increased lapse rates, compared to monthly billing), and billing type (auto-pay is associated with lower lapse rates than sending the premium bill, which is associated with lower lapse rates than a switch from auto-pay to a sent billing) among others.[14]Many of the Tower policies included in this proposed class are consistent with ART. The May 2021 SOA study indicated that the primary variables related to shock lapse were initial premium jump, attained age, billing type and premium mode [frequency of payment].

Given the numerous reasons why individuals may purchase life insurance, it is clear that the weight those reasons carry may change as circumstances evolve over the course of a policyholder's lifetime. The need for, and willingness to maintain, life insurance changes as individual circumstances change. Consumer decisions relating to the use of their life insurance policies span a wide range of possibilities, are described by research and analysis and, in some cases, are inferred from their revealed behavior, often with a delay from when the decisions are made, as is the case with the impact of health status on term-life policy lapsation around the end of the term period.

## VII.   Case-Specific Determinants of the Decision to Lapse

Plaintiff's class definition implies that every policyholder in the proposed class suffered a lapse because he or she did not receive the appropriate lapse notification from Tower within a certain period of time. As noted, Tower believes it has complied with the appropriate regulatory guidance related to lapse notification.[15]

Unrelated to any dispute over the sending of pending lapse notifications to policyholders, the academic research indicates that a policyholder may decide to terminate an insurance policy for a host of reasons. In fact, the decision to let a policy default and subsequently lapse may have

---

[14] Aisling Bradfield, Carolyn Covington, Rebecca Reppert, and Julien Tomas, U.S. Post-Level Term Lapse & Mortality Experience, Society of Actuaries, May 2021, p. 6 and, for a detailed description, Section 6, pages 43-80.

[15] Defendant Metropolitan Tower Life Insurance Company's Supplemental Responses and Objections to Plaintiff's Interrogatories, dated January 15, 2021, Supplemental Response to Interrogatory No. 3, pp. 7-8.

Confidential

been made years before the default and subsequent lapse occur. In some cases, the decision may have been made at the policy's origination, as many of the examples discussed below suggest.

Including policies in the proposed class where the decision not to keep the policy in force was wholly unrelated to any action by Tower, and was possibly the direct consequence of a purposeful decision to terminate a policy, would be inconsistent with policyholders' intent.

Individual inquiry beyond the records kept by Tower would be necessary to determine the true reasons for policyholder termination decisions and whether or not policyholders were even influenced by Tower's practice related to the sending of lapse notifications. In short, the allegation that every policyholder in the proposed class suffered a lapse as a consequence of not receiving appropriate notification is not supported by the literature, industry standards, or evidence reviewed in this matter.

## VIII.   The Random Sample of 100 Proposed Class Policies

In order to explore the actual behavior of policyholders in the proposed class, I directed staff at CRA to generate a random sample of 100 policy numbers from a list of proposed class policies provided by Tower. These randomly drawn sample policies give a glimpse into the range of policyholder behavior across the proposed class. The random sample was generated using Microsoft Excel's random number generator functionality. 50 of the 100 random policies were selected from the set of lapsed policies with insureds alive as of the May 2021 date and 50 policies were selected from the set of lapsed policies with insured believed dead. For those lapsed policies with the insured believed dead, the death occurred subsequent to the date when the policy lapsed. Given the composition of the proposed class presented in Table 1 above, the sample was designed to randomly select 45 term policies (25 from the set of lapsed policies with insureds alive and 20 from the set of lapsed policies with insureds believed dead) and 55 non-term policies (25 from the set of lapsed policies with insureds alive and 25 from the set of lapsed policies with insureds believed dead).

**Confidential**

**Table 2**
**Distribution of Randomly Sampled Policies by Type**

|  | Term Policies | Non-Term Policies | Total |
|---|---|---|---|
| Lapsed Policies with Insureds Alive | 25 | 25 | 50 |
| Lapsed Policies with Insureds Believed Dead | 20 | 30 | 50 |
| Total | 45 | 55 | 100 |

At my direction, CRA conducted a detailed analysis of the sampled policies and their files in order to understand, to the extent allowed by available documentation, the possible reasons for a policyholder's decision to terminate or let his or her policy lapse. The analysis allowed me to evaluate whether Tower policyholders experience was consistent with the academic and professional research reviewed above. The emphasis was on analyzing the policy file provided by Tower to understand policy cash flows, specific policyholder profiles, any communications with Tower, or any other information that could provide an indication of a policyholder's decision to actively terminate a policy. None of this information was recorded in Tower's administrative systems but, rather, is knowable only by detailed review of each set of policy records. In addition to the time required to gather all of the relevant records, each policy file took approximately 3.5 hours on average to review and analyze.

The policies discussed below comprise the entirety of the 100 policies sampled and illustrate the range of behaviors displayed by Tower's policyholders with respect to funding their policies, using them for cash accumulation, obtaining policy loans, and other behaviors that have been studied in the academic literature on lapse and termination behavior. Table 3 provides an overview of the sample policies consistent with the detailed description of the sample policies in the remainder of this report.[16]

---

[16] Exhibit 5 includes additional detail on a number of the policy files referenced below.  Exhibit 6 includes all redacted policy files referenced below.

Confidential

**Table 3**
**Categorization of Lapse and Termination Behavior**

| Term Life Insurance Sample | Policy Count |
|---|---|
| Guaranteed Level Term ("GLT") | |
| Lapsed Following GLT Period | 33 |
| Lapsed At Time Other Than GLT Period End | 6 |
| Named Plaintiff | 1 |
| Total GLT Policies | **40** |
| | |
| Term Life Policies | |
| Policyholders Stopped Automatic Premium | 4 |
| Additional Individual Inquiry Required | 1 |
| Total Term Life Policies | **5** |
| | |
| **Total Term Life Insurance Sample** | **45** |
| | |
| **Non-Term Insurance Sample** | |
| Actively Terminated | 8 |
| Active Policy Management Proximate to Lapse | 20 |
| Additional Individual Inquiry Required | 27 |
| **Total Non-Term Insurance Sample** | **55** |
| | |
| **Total Policy Sample** | **100** |

Plaintiff alleges that policies in the proposed class lapsed or terminated "without [Tower] first providing all the notices, grace periods, and offers of designation"[17] of the types Plaintiff identifies. My examination of the 100 sample policies, in the majority of cases, contradict Plaintiff's claim. For those where Plaintiff's claim is not contradicted, there is also not evidence to support Plaintiff's claim.

For example, Tower's interrogatory responses and the declaration of Deborah O'Donnell explain, and the documents that I have seen from sample files confirm, that all of its UL and VUL policies contain a contractual grace period of at least 60 days.[18] Tower further has explained that its UL policyholders receive an Annual Statement explaining when additional

---

[17] Plaintiff Susan A. Pitt's Notice of Motion and Motion for Class Certification, October 21, 2021, p. 3.

[18] Defendant Metropolitan Tower Life Insurance Company's Supplemental Responses and Objections to Plaintiff's Interrogatories, dated January 15, 2021, Supplemental Response to Interrogatory No. 3, p. 8; Declaration of Deborah O'Donnell in Opposition to Class Certification, December 2, 2021, p. 5 at ¶10.

Confidential

premium amounts must be paid in order to prevent lapse, and that notices are sent at least 30 days before a UL policy lapses to let the policyholder know that if the appropriate premium is not received by a certain date (at least 60 days after due), the policy is threatened to lapse.[19] The files that I have reviewed reflect these notices.

With respect to traditional policies (term life and whole life), Tower Interrogatory Responses and the O'Donnell declaration explained that for all but a very small subset of Term Life policies, its "policies are not terminated for failure to pay premium (or for lack of sufficient policy value to cover amounts due) fewer than 60 days following the last date of premium payment." Tower also explained that their "administrative practices also included communications to policyholders at least 30 days prior to termination notifying impending lapse."[20] The sample policy files I have seen confirm this. The Appendix (labeled "Amended Pitt Interrogatory Response Exhibit A") that Tower produced to Plaintiff, and accompanying Discovery responses, also confirm that policies are not terminated fewer than 60 days following the last date premium is due.

Tower's Interrogatory responses and the O'Donnell declaration further explain that since July 2014 it has provided policyholders of all in-force California issued individual life insurance policies with the opportunity to identify secondary designees for the receipt of lapse-related notices[21]. Files that I have reviewed reflect this offer of secondary designation beginning when such letters were added to individual files, which I understand was sometime in 2016 (see Declaration of O'Donnell). In the event that a policy does lapse, and a policyholder is interested in keeping the policy, Tower also offers policyholders the opportunity to reinstate a policy. For example, the reinstatement clause in Plaintiff's policy explains:[22]

---

[19] Declaration of Deborah O'Donnell in Opposition to Class Certification, December 2, 2021, pp. 6, 7 at ¶14, and pp. 14, 15 at ¶31.

[20] Defendant Metropolitan Tower Life Insurance Company's Supplemental Responses and Objections to Plaintiff's Interrogatories, dated January 15, 2021, Supplemental Response to Interrogatory No. 3, pp. 7-8; Declaration of Deborah O'Donnell in Opposition to Class Certification, December 2, 2021, pp. 14, 15 at ¶31.

[21] Declaration of Deborah O'Donnell in Opposition to Class Certification, December 2, 2021, p. 19 at ¶42; Defendant Metropolitan Tower Life Insurance Company's Supplemental Responses and Objections to Plaintiff's Interrogatories, dated January 15, 2021, Supplemental Response to Interrogatory No. 3, pp. 7-8.

[22] Susan A. Pitt, Individually, as Successor-In-Interest to Michael A. Pitt, Decedent, on Behalf of the Estate of Michael A. Pitt, and on Behalf of the Class, v. Metropolitan Tower Life Insurance Company, Class Action Complaint, April 9, 2020, Exhibit A, p. 5 of pdf.

Confidential

Within three years after a default in premium payment, but no later than the policy anniversary nearest the insured's 95th birthday, you may apply for reinstatement if:

1. You submit proof satisfactory to us that the insured is insurable by our standards; and
2. You pay all overdue premiums with interest at 6% per year compounded annually to the date of reinstatement; and
3. The insured is alive on the date we approve the request for reinstatement. If the insured is not alive, such approval is void and of no effect.

Any application for reinstatement becomes part of the contract of reinstatement and of this policy.

Subject to the above requirements, the effective date of reinstatement will be the date we approve the request for reinstatement. We will advise you of the reinstatement effective date.

As I will explain in detail below, a number of policyholders in the random sample of the proposed class took advantage of the opportunity to reinstate their policies. Some policyholders took advantage of this opportunity on more than one occasion.

## A. Term Insurance Termination or Lapse Behavior

### 1. Guaranteed Level Term Insurance Termination or Lapse Behavior

Of the 45 term policies in the sample, 40 were Guaranteed Level Term ("GLT") for either a 10- or 20-year period. At the end of the level term period, the premiums on a GLT policy are subject to a substantial increase in premium. Of these 40 GLT policies, 33 remained in force for the exact length of the respective level term period as illustrated in Exhibit 4. Across these 33 policies, the premiums were scheduled to increase by greater than 1,000% on average. Given the scheduled increase in premiums, it makes economic sense that the policyholders would make the decision, likely at the time of purchase when the premium schedule was set, to discontinue these policies at the end of the level term period. These results are entirely consistent with the SOA and Milliman studies I discussed earlier in this report.

The additional seven GLT policies included the policy of Plaintiff's husband, Michael Pitt. His policy (policy #3422247) was a GLT policy with a guarantee period of 20 years. His policy was still within the GLT period at the time it lapsed. Like Pitt's policy, the other 6 GLT

Confidential

term policies in the sample terminated at times other than at the end of the GLT period, indicating a need for further individual inquiry to understand the motives for lapsation. The policyholders of 3 of these 6 GLT policies from the sample displayed active management of the policy in the time leading up to, or sometimes after the level term period ended, as explained in further detail below.

 **Policy 3361929** was issued on May 13, 1998 with a 20-year GLT period and a $500,000 face amount.[23] In May 2016, 2017 and 2018, Tower sent the policyholder letters reminding her of her ability to select a third party to receive policy notifications when the "policy is in danger of terminating due to non-payment of premiums."[24] Tower's records do not reflect any election by the policyholder to designate a third party to receive notices.

 The GLT period, during which premiums due on this policy were $435 per year, ended on May 13, 2018.[25] The annual premium would increase substantially each year thereafter. As shown by the schedule of premium, the premium increased by approximately 436% in the first year after the GLT period. The premium would increase in each subsequent year, growing to an approximate 1,583% increase from the GLT period premium by the time the policyholder reaches age 63:[26]

---

[23] TOWER032465-492, at TOWER032467.

[24] TOWER032566-569; TOWER032570-573; TOWER032574-577.

[25] TOWER032465-492 at TOWER032468.

[26] TOWER032465-492, at TOWER032468.

**Confidential**

SCHEDULE OF CURRENT PREMIUMS

LEVEL BENEFIT TERM LIFE INSURANCE RENEWABLE TO AGE 95
WITH PREMIUM ADJUSTMENT PROVISION
INSURING AGE 28

POLICY
NUMBER
3,361,929

ANNUAL PREMIUMS FOR FACE AMOUNT ON POLICY SPECIFICATIONS PAGE

| RENEWAL AGES | RENEWABLE TERM PREMIUM |
|---|---|
| 29 | $435.00 |
| 30 | 435.00 |
| 31 | 435.00 |
| 32 | 435.00 |
| 33 | 435.00 |
| 34 | 435.00 |
| 35 | 435.00 |
| 36 | 435.00 |
| 37 | 435.00 |
| 38 | 435.00 |
| 39 | 435.00 |
| 40 | 435.00 |
| 41 | 435.00 |
| 42 | 435.00 |
| 43 | 435.00 |
| 44 | 435.00 |
| 45 | 435.00 |
| 46 | 435.00 |
| 47 | 435.00 |
| 48 | 2,330.00 |
| 49 | 2,490.00 |
| 50 | 2,670.00 |
| 51 | 2,860.00 |
| 52 | 3,075.00 |
| 53 | 3,330.00 |
| 54 | 3,590.00 |
| 55 | 3,865.00 |
| 56 | 4,155.00 |
| 57 | 4,435.00 |
| 58 | 4,710.00 |
| 59 | 5,000.00 |
| 60 | 5,340.00 |
| 61 | 5,745.00 |
| 62 | 6,255.00 |
| 63 | 6,885.00 |

10280

3,361,929

Given the age of the insured at the end of the level term (age 48), an economically rational option could have been using the conversion privilege offered in the policy to buy new level term insurance on the same basis as this policy without having to submit an application for underwriting if done during the level term period:[27]

---

[27] TOWER032465-492, at TOWER032468.

Confidential

**CONVERSION  PRIVILEGE  ENDORSEMENT**

Issued  by  General  American  Life  Insurance  Company

The first paragraph of the Conversion Privilege of your policy is hereby deleted and
replaced with:

While this policy is in force, you may exchange this policy in its entirety for a
new policy by making a written request prior to the Conversion Date as shown
on the Policy Specifications page.

The policyholder received an Annual Statement on a yearly basis that included the premium for the coming year. For the first 20 years of the policy, the annual premium was $435. The April 23, 2018, annual Statement reflected the upcoming drastic increase in premiums - providing that in year 21, the annual premium would be $2,330, an approximate 678% increase.[28] Notwithstanding the increased premium, the policyholder paid the annual premium due on May 4, 2018.[29]

The following year, premium was due on February 13, 2019. On February 14, 2019, an insurance agent called Tower on behalf of the policyholder to discuss the increased premium. The insurance agent explained that the policyholder was trying to determine whether or not it made sense to continue the policy and pay the premium after the level term.[30] He also wanted to confirm that the conversion option was no longer available as the level term period had ended.[31]

No premium was paid. On March 18, 2019, Tower sent a notice of Special Courtesy Offer to the policyholder, indicating that if payment was made by April 6, 2019 the policy would remain in force.[32] The policyholder had once previously paid the premium beyond the policy's contractual 30-day grace period, in 2013.[33] But this time, after the level term period, no premium was paid.

The policy terminated on April 19, 2019, two months after the agent call and more than 60 days following the premium due date, as well as more than 30 days following the Special

---

[28] TOWER032551-555.

[29] TOWER032449-454.

[30] TOWER032587.

[31] TOWER032587.

[32] TOWER032525-526.

[33] TOWER032578-579.

**Confidential**

Courtesy notice.[34] On April 22, 2019, again, Tower wrote to the policyholder and indicated that while the policy was no longer in force, the policy could still be reinstated by simply paying the past due amount and the current months premium due and filling out the reinstatement form.[35]

There were no additional calls from the policyholder or that agent reflected in Tower's records and no attempt to reinstate the policy. This individual policy file review indicates the conscious decision by the policyholder to no longer keep the policy after the level term. It is not possible to know these crucial facts without individual inquiry. Notwithstanding, this file review is indicative of what the research and data provide. Namely, that after the level term, policyholders make a decision whether to pay the dramatically increasing premium or terminate their policies. For those, like the holder of Policy 3361929, there was the clear intent after the level term to end coverage. The decision was to terminate the policy. This is what the policyholder wanted. It cannot be said that the policyholder suffered any injury for the policy having terminated by lapse - as she wished.

**Policy 3710095** was issued on September 18, 2003 with a 10-year GLT period and a $500,000 face amount.[36] The annual premium for the 10-year level term was $750.[37] After the GLT period, the annual term premium began at $6,970, an increase of approximately 929%.[38]

Tower sent the policyholder notice that payment of the premium was due on November 18, 2012.[39]

On December 19, 2012, the policyholder called because he was still receiving notices about the payment of the premium. The file notes reflect he was "TOLD TO DISREGARD BILLING AND POLICY WILL LAPSE ON ITS OWN."[40]

Because the policyholder did not pay the premium due on November 18, 2012, the policy entered the grace period. On December 21, 2012, more than 30 days prior to lapse, the policyholder was still provided with a Special Courtesy Offer to pay premium by January 9,

---

[34] TOWER032549.

[35] TOWER032549.

[36] TOWER033848-849.

[37] TOWER033848-849.

[38] TOWER033848-849.

[39] TOWER033873-874.

[40] TOWER033856-857.

Confidential

2013.[41] The policy ultimately lapsed on January 22, 2013,[42] more than 60 days following the premium due date, and approximately 8 months before the level term period ended. Information the policyholder was presumably aware of, based on his phone call to Tower.

A notice that the policy had lapsed was sent on January 23, 2013, informing the policyholder that he could reinstate coverage by making a premium payment and submitting a reinstatement form.[43]

No premium was paid. The policyholder had affirmatively contacted Tower, confirmed he could disregard billing and let the policy lapse on its own, and did so before the end of his level term. This policy file represents the critical information obtained by individualized inquiry into the policy records. Here it is undeniable the policyholder allowed the policy to lapse.

**Policy 3358711** was issued on March 30, 1998 with a 20-year GLT period and a $100,000 face amount.[44] At the end of the GLT premium period, the annual premium amount increased from $258.00 to $2,286, an approximate 786% increase, and was scheduled to continue to increase each year thereafter.[45]

Tower's policy file includes a March 15, 2016 letter, through which Tower notified the policyholder of her right to designate a third party to receive duplicates of notices. The March 15, 2016 letter stated, in part, that Tower was notifying her of "[the] right to select one or more persons to receive duplicates notices if [her] policy is in danger of terminating due to non-payment of premiums."[46] Tower sent this third-party designee letter to the policyholder, further informing her of this right and opportunity, on at minimum an annual basis in 2016, 2017, 2018 and 2019.[47]

The level term period expired in 2018.[48] On October 18, 2019, a financial representative emailed Tower and explained that the policyholder was "in the process of applying for a new

---

[41] TOWER033881-884.

[42] TOWER033862.

[43] TOWER033862.

[44] TOWER032028-054, at TOWER032030.

[45] TOWER032028-054, at TOWER032031.

[46] TOWER032182-85.

[47] TOWER032186-89; TOWER032190-193; TOWER032194-97.

[48] TOWER032028-054, at TOWER032030.

**Confidential**

Term Insurance policy with another Insurance carrier."[49] The policy file includes a notice related to the replacement policy dated November 15, 2019.[50]

On December 9, 2019, Tower sent the policyholder a Notice of Payment Due, indicating that the quarterly premium of $642.54 was due on or before December 30, 2019.[51] The policyholder did not make that payment. On January 27, 2020, Tower provided the policyholder with a Special Courtesy Offer, which requested payment of the overdue amount of $642.54 by February 20, 2020.[52] Tower provided written notice to the policyholder that the policy had lapsed on March 6, 2020, 67 days after premium had been due, because the premium due on December 30, 2019 was never paid.[53] This letter provided the policyholder with information on how to reinstate the policy.[54]

On August 4, 2020, an insurance agent called Tower on behalf of the former policyholder to ask that Tower stop sending information to the former policyholder.[55] The agent informed Tower that the policyholder had wanted the policy to lapse, but that due to COVID-19, the policyholder was still receiving notices from Tower. The agent asked Tower to designate the policy as lapsed in the system, so that the policyholder would not receive any additional notices.

The file reflects that the policyholder wanted to let the policy lapse, likely because she was replacing it with another insurance policy. That decision to replace the policy was likely influenced by the significant increase in annual premiums following the end of the 20-year level term period. Ultimately, regardless of the policyholder's rationale, her agent's call to Tower confirmed that the policyholder (1) had chosen to let the policy lapse, (2) did not want to take advantage of any special offers related to COVID, and (3) did not want to receive any more notifications regarding the policy.

---

[49] TOWER032016-017.

[50] TOWER032014-015.

[51] TOWER032279-282.

[52] TOWER032084-089.

[53] TOWER032094-097; TOWER032108-109.

[54] TOWER032108-109; TOWER032094-097.

[55] TOWER032022.

Confidential

**Policy 3814015** was issued on July 31, 2002 with a 20-year GLT period and a $2 million face amount.[56] The policyholder and his third-party representative were sent communication indicating that a premium payment was due on July 31, 2012.[57] The premium was not received, and the policy entered the grace period on July 31, 2012 after exactly 10 years. The policyholder and his third party representative were subsequently sent a special courtesy offer to reinstate the policy by September 21, 2012 by paying the premium.[58] The policyholder and his third party representative were sent notification that the policy had lapsed on October 5, 2012.[59]

There is nothing in the policy file that indicates a reason why the policyholder may have elected to terminate the policy.

**Policy 3834969** was issued on December 1, 2002 with a 20-year GLT period and a $300,000 face amount.[60] This policy had a guaranteed level term of 20 years. After 17 years of being in force, Tower sent notice that the premium was due on December 1, 2019.[61] That premium was not paid, and the grace period began on December 1, 2019. The policyholder and his third party representative were sent communication indicating that premium payments were due, the lapse letter and a special courtesy offer to pay the premium by January 22, 2020 in order to retain the policy.[62] The policy ultimately lapsed on February 4, 2020.[63] On February 5, 2020 the policyholder and his third party representative were sent notification that the policy had lapsed.[64]

There is nothing in the policy file that indicates a reason why the policyholder elected to terminate the policy.

---

[56] TOWER033944-962, at TOWER033944.

[57] TOWER033967-968.

[58] TOWER033976-979; TOWER033980-981.

[59] TOWER033982; TOWER033985-987.

[60] TOWER027729-748, at TOWER027748; TOWER027801-802.

[61] TOWER027801-802

[62] TOWER027801-802; TOWER027840-843; TOWER027844-846; TOWER027751; TOWER027752-754; TOWER027755-756.

[63] TOWER027751.

[64] TOWER027751; TOWER027752-754.

Confidential

**Policy 3396425** was issued on December 14, 2001 with a 10-year GLT period and a $250,000 face amount.[65] The annual premium on the policy was $237.50 for the GLT period.[66] Following the GLT period, the policyholder continued to make premium payments for approximately 21 months at increased annual premium levels of $1,125 and $1,187.50, respectively.[67] The policyholder was sent communication indicating that premium was due on August 14, 2013.[68] The bank account used to facilitate premium payments did not allow a withdrawal of $103.81 on August 20, 2013.[69] The policyholder and a third party representative were sent a special courtesy offer that expired on October 5, 2013 to retain the policy by paying the premium due.[70] On October 21, 2013, the policyholder and her third party representative were sent notification that the policy had lapsed.[71]

There is nothing in the policy file that indicates a reason why the policyholder elected to terminate the policy.

As noted in Exhibit 4, the vast majority of GLT policies in the sample were terminated at the exact end of the GLT period. The remaining GLT policies in the sample provided either indications that policyholders actively decided to terminate the policy or provided no indication of why the policyholder may have elected to terminate the policy. Aside from the allegations of the named Plaintiff, there is no indication in any GLT policy file that a lapse occurred because the policyholder wanted the coverage to continue but missed the grace period and then was not able to reinstate.

## 2. Other Term Insurance Termination or Lapse Behavior

The remaining 5 term policies were not GLT policies. They are known as "term-life" policies. Tower's Term-life policies included guaranteed premium levels for a number of years and then are convertible to other types of insurance at certain times as defined in the policy contract. Of these remaining 5 term policies included in the random sample, there are indications

---

[65] TOWER033176-206, at TOWER033178.

[66] TOWER033176-206, at TOWER033180.

[67] TOWER033176-206, at TOWER033180.

[68] TOWER033258-259.

[69] TOWER033246.

[70] TOWER033248-249; TOWER033254-257.

[71] TOWER033248-249; TOWER033254-257; TOWER033258-259; TOWER033262; TOWER033265-267.

Confidential

found in the policy files that the policyholders of 4 of the policies actively stopped their automatic premium payments. Information related to these 5 remaining term policies is provided below.

**Policy 3287297** was issued on August 9, 1993, and was a yearly renewable term policy with a $100,000 face amount.[72] The policyholder made regular premium payments on a quarterly basis,[73] until failing to make a quarterly premium payment due on August 9, 2015.[74] On July 20, 2015, Tower sent the policyholder a notice of premium due.[75] Since premium was not received, on September 11, 2015, Tower sent her a Special Courtesy Offer, indicating that the overdue amount of $205.35 could be paid on or before September 30, 2015, and keep her policy.[76] The policyholder made the past-due payment and kept the policy in force. The policyholder's payment in September 2015[77] – a year before she ultimately terminated the policy – shows she understood that Tower provided a grace period of longer than 30 days.

On September 15, 2015, the policyholder requested to reduce the face amount of the policy from $100,000 to $50,000[78] an indication that she no longer required the $100,000 of coverage. On July 1, 2016, Tower sent the policyholder a letter, offering her the opportunity to convert her term policy to a permanent policy and notifying her that if she did not "exercise this conversion option, the premium for [her] term life coverage will increase beginning 08/09/2016."[79]

On July 19, 2016, Tower sent the policyholder her next regular Notice of Payment Due, notifying the policyholder that her premium payment was due on August 9, 2016.[80] A copy of an August 15, 2016 letter in the file reflects that Tower provided the policyholder written notice of

---

[72] TOWER031451-479, at TOWER031452.

[73] TOWER031493-494.

[74] TOWER031573-574.

[75] TOWER031573-574.

[76] TOWER031591-592.

[77] TOWER031322-327.

[78] TOWER031328; TOWER031344-450 at TOWER031385.

[79] TOWER031544.

[80] TOWER031561-562.

Confidential

the right to designate a third party to receive notices.[81] An excerpt from the letter reads as follows:

**Why we're contacting you**
State law requires we notify you annually of your right to select one or more persons to receive duplicates of notices if your policy is in danger of terminating due to non-payment of premiums.

**What you need to know**
You should consider selecting a trusted adult who has a natural interest in your welfare and that you inform that individual of your decision.

**What you need to do**
If you would like to designate a third party to receive these notices, or change your current designation, please complete, sign and return the enclosed form. To remove your third party designee, inform General American in writing.

**What will happen if we don't hear from you**
If you do not wish to exercise this option, no further action is needed.

**We're here to help**
If you have any questions, please contact your representative or call our Customer Service Center. You can reach us at 1-800-638-9294 Monday through Friday between 9 a.m. and 6 p.m., ET.

The August 15, 2016 letter enclosed the Third-Party Designation Form for the policyholder to complete.[82] There is no evidence that the policyholder ever returned a completed Third Party Designation Form to Tower.

On August 29, 2016, after not making her August 9, 2016 payment, the policyholder called Tower and expressly informed Tower that it was her plan to cancel the policy.[83] The call notes read as follows:[84]

Case Number:      00002-58296-871START/STOP TIME:   29-AUG-2016 15:22:33.164 - 29-AUG-2016 15:25:39.587CSC:      Trahan, MicheleSession Notes:      NoneContract Number:   3287297 - GenAmCaller Relationship: Owner      Passed Security:   YContract Notes:   BIRTH DATE 61APR05   customer wants to cancel pol. advised after special courtesy offer ends it will just lapse/go away. no consequences to credit...

---

[81] TOWER031575-578.

[82] TOWER031575-578.

[83] TOWER031339-341.

[84] TOWER031339-341.

**Confidential**

On September 12, 2016, more than 30 days prior to lapse, Tower sent the policyholder and her agent a Special Courtesy Offer requesting the overdue premium be paid by September 30, 2016 in order to keep the policy in force.[85]

Tower sent the policyholder and her agent a letter informing her that the policy had lapsed on October 14, 2016, more than 60 days following the premium due date.[86] The letter provided the policyholder with information on reinstatement and encouraged the policyholder to contact Tower with any questions.[87] Given that the policyholder had previously expressed her decision to terminate the policy in a phone call, she did not respond to the letter.[88]

This policy terminated because the policyholder affirmatively expressed her decision to allow the policy to lapse in a phone call she placed to Tower, and then – in accordance with her plan – did nothing when the policy lapsed two months later. As discussed, the policyholder had previously paid late premium, and clearly understood how to bring the policy current if she wanted to exercise that option.

**Policy TL0013674H** was issued on December 28, 1999, and was a term life policy with a face amount of $150,000 and a premium guarantee that lasted for first 18 years of the policy.[89] On April 1, 2014, Tower provided the policyholder with the third-party designee letter, affording the policyholder the option to "name another person to receive duplicate notices about pending policy lapse or termination of coverage due to non-payment of premiums."[90]

On November 15, 2016 the policyholder called Tower to stop the EFT payments and informed Tower that he did not want the policy after May 6, 2017.[91] This is entirely consistent with the 18-year premium guarantee. On April 18, 2017 the policyholder called to verify that EFT had been stopped.[92] The policy lapsed on June 7, 2017.

---

[85] TOWER031601-602; TOWER031603-606.

[86] TOWER031607; TOWER031608-610; TOWER031310-312.

[87] TOWER031607; TOWER031608-610; TOWER031310-312.

[88] TOWER031339-341.

[89] TOWER038078-168, at TOWER038079; TOWER038168.

[90] TOWER038070-077.

[91] TOWER038069.

[92] TOWER038069.

Confidential

The policyholder's communications with Tower – stopping EFT payments and expressly stating that he no longer wanted the policy as it approached the 18-year anniversary is confirmation that the policyholder made a conscious and informed decision to let the policy lapse.

**Policy TL0012929H** was issued on December 28, 1999, and was a term life policy with a face amount of $100,000 and a premium guarantee that lasted for the first 18 years of the policy.[93] On July 14, 2016, the policyholder called to have the EFT payment option removed effective July 14, 2016.[94] The policy lapsed on August 22, 2016. The cancellation of the EFT payment is an indication that the policyholder actively decided to terminate this policy and consistent with the forthcoming end of the premium guarantee period.

**Policy 3504178** was issued on July 1, 1987, and was a term policy with a face amount of $100,000.[95] As documented in the policy contract, the premium on this policy increased on an annual basis.[96] It remained in force for approximately 28 years with a paid-to date of exactly 28 years.[97] On July 3, 2015, Tower discontinued EFT payment on the account per the policyholder's request.[98] A special courtesy offer was sent to the policyholder and her third party representative informing her that she could make the required premium payment by August 22, 2015, to keep the policy in force.[99] The policy lapsed on September 7, 2015.[100] The cancellation of the EFT payment is an indication that the policyholder actively decided to terminate this policy.

---

[93] TOWER038015-068, at TOWER038016; TOWER03864.

[94] TOWER038003; TOWER038004-014, at TOWER038010.

[95] TOWER025028-050, at TOWER025028.

[96] TOWER025028-050, at TOWER025030.

[97] TOWER025059-062; TOWER025028-050, at TOWER025028; TOWER025087.

[98] TOWER025075.

[99] TOWER025077-080; TOWER025081-082.

[100] TOWER025087.

**Confidential**

**Policy 3067590** was issued on May 15, 1987, and was a term policy with a face amount of $150,000.[101] It was in force for 27 years before it lapsed.[102] As documented in the policy contract, the premium on this policy increased on an annual basis.[103]

On April 24, 2014, Tower sent the policyholder a Notice of Payment Due, notifying him that the annual premium of $6,972 was due on or before May 15, 2014.[104] After payment was not made, on June 17, 2014, Tower sent a Special Courtesy Offer to the policyholder, notifying him that the overdue amount of $6,972 could be paid on or before July 6, 2014.[105] Tower sent written notice to the policyholder, informing him that the policy had lapsed on July 22, 2014, more than 60 days following the premium due date, because the premium due on May 15, 2014 was not paid.[106] The letter provided the policyholder with information on how to reinstate the policy.[107]

The policy's annual premium amount was set to increase from $6,972 in 2014 to $7,851 in 2015.[108] It is possible that the policyholder may have let the policy lapse due to the continuing increase in the cost of the premiums, but the file is inconclusive as to the reason.

### B.  Non-Term Insurance Termination or Lapse Behavior

The remaining policies in the sample were universal life, variable universal life and whole life insurance policies included within the sample. The termination or lapse behavior of these sampled policies are discussed in detail below.

### 1.  Policy File Indicates Active Termination

For eight of the Universal Life policies in the random sample, the policyholder either called Tower to discuss a pending lapse notice and/or actively discussed an intention to terminate the policy or let it lapse. Each of these examples confirm that Tower delivered timely lapse notifications to policyholders.

---

[101] TOWER031184-208, at TOWER031185.

[102] TOWER031184-208, at TOWER031185; TOWER031294.

[103] TOWER031184-208, at TOWER031186; TOWER031250-251; TOWER031248-249; TOWER031252-253.

[104] TOWER031254-55; TOWER031252-253.

[105] TOWER031284-285.

[106] TOWER031294.

[107] TOWER031294.

[108] TOWER031180-182.

Confidential

**Policy 840387456** was a universal life policy issued on May 21, 1984, with a face amount of $100,000.[109] On August 21, 2018, Tower sent a Notification of Pending Lapse to the policyholder, informing him that a payment of $1,571.32 was due on or before October 21, 2018 in order keep the policy in force.[110] On October 18, 2018, the policyholder called Tower related to the "lapse notice and options," demonstrating he received the notice and was aware of the impending lapse.[111]

The policy lapsed on October 21, 2018, more than 60 days following the date that cash value became insufficient to cover the policy's monthly charges.[112] Tower sent a Notice of Lapse to the policyholder, notifying him that the policy lapsed because the cash value of the policy as of August 21, 2018 was not sufficient to cover the monthly charges, and Tower did not receive the required payment. The letter also provided information on how to reinstate the policy.[113] Following the lapse, the policyholder made two more calls to Tower on October 26, 2018 and November 14, 2018.[114] The discussion with Tower related to the significant increase in premiums under the terms of the policy. The policyholder expressed that because his wife had died, he no longer had anyone to worry about in terms of continued coverage.[115] On his final call with Tower, the policyholder explained that he did not intend to reinstate the policy, demonstrating he was aware of his ability to apply for reinstatement.[116] Ultimately, the policyholder made an intentional and informed decision to let the policy lapse because he no longer needed the policy.

**Policy 894377545** was a universal life policy that was issued on April 1, 1989, with a face amount of $25,000.[117] On January 2, 2013, Tower sent the policyholder a Notification of Pending Lapse,[118] notifying the policyholder that there was insufficient value in the policy and

---

[109] TOWER025524-547, at TOWER025525.

[110] TOWER025586.

[111] TOWER025549.

[112] TOWER025602-603.

[113] TOWER025602-603.

[114] TOWER025605; TOWER025606.

[115] TOWER025604.

[116] TOWER025606.

[117] TOWER029749-767, at TOWER029750.

[118] TOWER029738.

Confidential

that a payment of $713.14 was due by March 3, 2013 to retain coverage.[119] An interim payment of $25, the scheduled amount, was made. On February 1, 2013, Tower sent the policyholder a further Notification of Pending Lapse,[120] notifying the policyholder that a payment of $688.14 still must be made by March 3, 2013 in order to retain coverage. On March 1, 2013, Tower sent the policyholder another Notification of Pending Lapse,[121] notifying the policyholder that a payment of $633.14 must be made by March 3, 2013 in order to retain coverage.[122]

On March 4, 2013, Tower sent the policyholder a lapse letter, notifying the policyholder that because the cash value of the policy was insufficient to cover the monthly deduction for premiums as of January 1, 2013, coverage terminated on March 3, 2013.[123]

Approximately two years later, on February 23, 2015, the policyholder's representative called—with an understanding that the policy had been terminated in 2013—to confirm the policy had no cash value.[124] The representative needed paperwork from Tower related to Medicare.[125] The policyholder and the representative clearly understood this policy had been terminated.

On February 25, 2015, Tower sent the policyholder information in response to the policyholder's request for values on the policy.[126] The February 25, 2015 letter stated, in part, that "[t]here was insufficient value in this policy to cover the cost of insurance due on January 1, 2013. Therefore, your policy lapsed and there is no cash surrender value."[127]

The proper notices were sent to the policyholder leading up to and after the lapse of March 3, 2013. Based on the phone call from the policyholder's representative, it appears that the policyholder made an informed decision to let the policy lapse and needed paperwork to prove the lapse occurred, as such documentation was necessary for Medicare-related reasons.

---

[119] TOWER029738.

[120] TOWER029740.

[121] TOWER029742.

[122] TOWER029742.

[123] TOWER029743.

[124] TOWER029770; TOWER029745; TOWER029746-748.

[125] TOWER029745.

[126] TOWER029741.

[127] TOWER029741.

Confidential

**Policy 890815239** was issued on August 28, 1989, with a face amount of $120,000.[128] The policyholder called Tower and stated that he was surrendering the policy.[129] The policyholder expressed that the policy had been purchased to support his spouse after his death.[130] The policyholder further explained that given the appreciation in the value of his real estate and advanced age, he no longer felt he needed the policy.[131]

On September 28, 2015, Tower sent the policyholder a Notification of Pending Lapse, which provided, in part, that a payment of $371.36 had to be paid by November 28, 2015 to retain coverage.[132] On November 30, 2015, Tower sent the policyholder a Notification of Pending Lapse, which provided, in part, that a payment of $483.16 had to be made by January 28, 2016 to retain coverage.[133] The policy was terminated as of January 28, 2016. On January 28, 2016, Tower sent the policyholder a Notice of Policy Lapse, which notified the policyholder, in part:[134]

---

Recently we sent you a Notice indicating the cash value of your life insurance policy was not sufficient to cover the monthly charges. We did not receive the required payment to keep your policy active. As a result, your policy terminated.

If you wish to reinstate the policy, please complete the application on the reverse side of this Notice and return it with any additional premium due in the enclosed envelope.

If we do not receive your reinstatement application within 30 days of the date of this Notice or if we do not approve your reinstatement, we will refund to you any payment received after policy termination.

If you apply for a reinstatement, some services in connection with your reinstatement application may be performed by our affiliate,    MetLife  Global Operations Support Center Private Limited. This service arrangement in no way alters    METROPOLITAN TOWER LIFE INSURANCE COMPANYs obligations to you.

If you have already reinstated this policy, please disregard this Notice.
Thank you for choosing   MetLife . View and update your account at www.eservice.metlife.com. Simple.Secure.Efficient

---

[128] TOWER036109-131, at TOWER036110. In 2007 the face amount was decreased to $105,000 per the contract.

[129] TOWER036103; TOWER036104; TOWER036105; TOWER036106; TOWER036160-161; TOWER036107-108.

[130] TOWER036103.

[131] TOWER036103.

[132] TOWER036155.

[133] TOWER036156.

[134] TOWER036158-159.

**Confidential**

Ultimately, this file reflects that the policyholder made a conscious and informed decision to terminate the policy by letting it lapse because he no longer needed the policy.

**Policy 895276983** was issued on January 26, 1990, with a face amount of $100,000.[135] The policyholder's spouse called Tower on January 9, 2015, during the grace period.[136] The spouse confirmed receipt of the pending lapse notice and inquired about the payment necessary to keep the policy in force.[137] During the call, the spouse requested that Tower cancel the automatic payments from the bank account that funded the policy.[138] The policy terminated on January 26, 2015.

The policyholder actively decided to terminate this policy.

**Policy 885176039** was a universal life policy issued on December 15, 1988, with a face amount of $160,000.[139]

Tower provided the policyholder with written notices of the right to designate a third party to receive duplicate notices, and the accompanying forms, on December 15, 2016; December 15, 2017; December 17, 2018; and December 16, 2019.[140] The letters provided, in part:[141]

---

[135] TOWER036554-577, at TOWER036555.

[136] TOWER036582; TOWER036552.

[137] TOWER036552.

[138] TOWER036552; TOWER036631-632; TOWER036646.

[139] TOWER036057-076, at TOWER036058.

[140] TOWER036085-88; TOWER036089-92; TOWER036093-96; TOWER036097-036100.

[141] TOWER036085-88; TOWER036089-92; TOWER036093-96; TOWER036097-036100.

**Confidential**

**Dear** ████████████

**Why we're contacting you**
State law requires we notify you annually of your right to select one or more persons to receive duplicates of notices if your policy is in danger of terminating due to non-payment of premiums.

**What you need to know**
You should consider selecting a trusted adult who has a natural interest in your welfare and that you inform that individual of your decision.

**What you need to do**
If you would like to designate a third party to receive these notices, or change your current designation, please complete, sign and return the enclosed form. To remove your third party designee, inform MetLife in writing.

**What will happen if we don't hear from you**
If you do not wish to exercise this option, no further action is needed.

**We're here to help**
If you have any questions, please contact your representative or call our Customer Service Center. You can reach us at 1-800-638-5000 Monday through Friday between 9 a.m. and 6 p.m., ET.



On July 15, 2020, Tower sent the policyholder a Notification of Pending Lapse, notifying the policyholder that in order to retain coverage a payment of $766.97 needed to be paid by September 14, 2020.[142] The scheduled premium amount was paid ($70), but not the amount actually due to keep the coverage in force. On August 3, 2020, Tower sent the policyholder a Notification of Pending Lapse, notifying the policyholder that in order to retain coverage a payment of $696.75 must be paid by September 14, 2020.[143] Again, $70 was paid. On September 1, 2020, Tower sent the policyholder another Notification of Pending Lapse, notifying the policyholder that in order to retain coverage a payment of $626.51 must be paid by September 14, 2020.[144]

The policyholder called Tower twice during the grace period and acknowledged receiving the pending lapse notices.[145] The policyholder inquired about the premium amounts

---

[142] TOWER036080.

[143] TOWER036081.

[144] TOWER036082.

[145] TOWER036078-079; TOWER036101; TOWER036102.

**Confidential**

due.[146] The policyholder also confirmed with Tower that he did not need to take any action if he did not want to keep the policy.[147]

The policy lapsed on September 14, 2020. On that day, Tower sent the policyholder a Notice of Policy Lapse, explaining why the policy had lapsed and how to reinstate the policy.[148]

The policy file reflects that the policyholder was aware of his right to designate third parties to receive notices and of his rights and options related to the lapse of the policy. The policyholder expressly confirmed that he was aware of the pending lapse and appears to have made an informed decision to let the policy lapse.

**Policy 106502075** was issued on April 1, 1987, with a face amount of $100,000.[149] Tower sent the policyholder notices in April 2016 and 2017 notifying the policyholder of the right to designate a third party to receive policy notices.[150] On August 3, 2017, Tower notified the policyholder of an increase in the monthly automatic premium payment to $210.93.[151] On August 4, 2017, Tower stopped this automatic payment as a result of the request of the policyholder.[152] The policy lapsed on October 7, 2017.[153] The policyholder's agent was also sent copies of the pending lapse letter and the lapse notice.[154]

The policyholder was actively engaged in communication with Tower around the time this policy terminated and took action towards termination by stopping the automatic payment of premium on the policy.

**Policy 3233438** was a whole life insurance policy issued on May 10, 1990, with a face amount of $150,000.[155] The policyholder and the agent on the policy requested and received information related to policy values, tax consequences and other financial information in the

---

[146] TOWER036101; TOWER036102.

[147] TOWER036102.

[148] TOWER036083-084.

[149] TOWER030947-980, at TOWER030947.

[150] TOWER030919-922; TOWER030923-926.

[151] TOWER030927-930; TOWER030934.

[152] TOWER030935-936.

[153] TOWER030943.

[154] TOWER030931-933; TOWER030944-946.

[155] TOWER024153-158.

Confidential

three month period before the policy lapsed.[156] Tower's documentation on communication with the policyholder indicates that the policyholder was reviewing the policy related to surrender.[157] The policy lapsed on July 14, 2014.[158]

The policyholder was actively engaged in communication with Tower around the time this policy terminated and actively considered termination of the policy.

**Policy 3938209** was a whole life policy issued on May 19, 1997, with a face amount of $500,000.[159] The policyholder had a history of loans on the policy, with premium being paid during certain periods of time by the automatic premium loan provision in the policy (i.e., premium and loan interest was paid by increasing the amount of the loan on the policy.)[160]

The policy appears to have been assigned to Guaranty Federal Bank, FSB, which received duplicate copies of policy notices.[161] An agency, representing the policyholder, is also shown as having received duplicate copies of notices.[162] The policy file also contains numerous Special Courtesy Offers, indicating a history of late payments on this policy.

The policyholder explored surrender options on this and another Tower policy on multiple occasions, going as far as to complete a Policy Surrender Request on November 16, 2012 that was not ultimately processed, because the policy had been assigned to a bank.[163]

On April 10, 2014, the policyholder submitted a Policy Loan Request, seeking a loan in the amount of $100,000 against the policy's value, which was approved and funded by Tower.[164]

---

[156] TOWER024153-58; TOWER024159-166, at TOWER024162-163; TOWER023870; TOWER023871-872; TOWER023831-832; TOWER023833-834; TOWER023835-836; TOWER023837-838; TOWER023816-817; TOWER023818-819; TOWER023825; TOWER023861-864.

[157] TOWER023829-830; TOWER023804-805; TOWER023808-809; TOWER023810-811.

[158] TOWER024282-283.

[159] TOWER028089-121, at TOWER028089.

[160] TOWER028514-517.

[161] TOWER028524-529.

[162] TOWER028676-681.

[163] TOWER028051-059.

[164] TOWER028026-029; TOWER028032.

Confidential

When the policy eventually lapsed, it was carrying a large loan.[165] The policyholder requested a summary of the policy values for tax purposes in March 2015.[166]

On January 29, 2015, Tower sent the policyholder a Notice of Payment Due, notifying the policyholder that a quarterly premium of $5,719.72 was due on or before February 19, 2015.[167]

On March 20, 2015, a representative called Tower on behalf of the policyholder, relaying the policyholder's desire to surrender and cash out the policy.[168] On March 24, 2014, Tower sent the policyholder a Special Courtesy Offer, notifying the policyholder that the $5,719.72 was due on or before April 12, 2014.[169] Tower sent the policyholder a Special Courtesy Offer due May 19, 2015. At that time the policyholder owed $5,719.72 in premium and $15,237.61 in loan interest. A duplicate copy of that notice was sent to Guaranty Federal Bank FSB and to the agency.[170] A Special Courtesy Offer was sent to both the policyholder and his agent, and Guaranty Federal Bank on June 22, 2015.[171] On July 24, 2015, the policy lapsed.[172]

Tower provided written notice to the policyholder, notifying him that the policy had lapsed because the "premium due on May 29, 2015 remains unpaid."[173] That notice, a duplicate copy of which also was sent to Guaranty Federal Bank, also informed the policyholder that the policy contained a non-forfeiture provision, which meant that "the available net cash value at the time of the lapse was used to purchase extended term insurance," in the amount of $231,751.00, to and through August 19, 2015. The letter additionally explained how the policyholder could seek reinstatement by payment of premium and loan interest due.[174]

---

[165] TOWER028580-581; TOWER028576-579; TOWER028077-078; TOWER028061-063.

[166] TOWER028778-784, at TOWER028780-781; TOWER028003; TOWER028000; TOWER028045-049; TOWER028060; TOWER028207-212, at TOWER028208-209.

[167] TOWER028202-205.

[168] TOWER028845; TOWER028000.

[169] TOWER028221-224.

[170] TOWER028460-463.

[171] TOWER028464-469, at TOWER028466.

[172] TOWER028033.

[173] TOWER028033.

[174] TOWER028574-575, TOWER028580-581.

Confidential

The policyholder and his representatives were actively engaged in communication with Tower prior to termination, having his representative call and inform Tower that he wanted to surrender and cash out the policy. An assigned bank was copied on all communications. This is clearly a situation where there was an informed and intentional decision to let the policy lapse.

### 2. Policy File Indicates Active Policy Management Around the Time of Termination or Lapse

For 20 of the Universal Life policies included in the random sample, the policy files indicate active management of the policy around the time of ultimate policy lapse. In many of these instances pending lapse and lapse notifications led to the policy activity and discussions with Tower.

**Policy 844385609** was issued on April 27, 1984, with a face amount of $50,000.[175] In February and October 2015 the policyholder attempted to change the beneficiary on the policy but Tower informed the policyholder that he not correctly fill out the forms.[176] In November 2015, the policyholder filed the change in beneficiary forms again.[177] The policyholder was sent a notification of pending lapse indicating that the premium was due by December 27, 2015.[178] On December 3, 2015, the policyholder called Tower related to the outstanding loan on the policy and premium due.[179] Both the policyholder and agent called Tower after receiving the notice of pending lapse and discussed it with a representative.[180] The policy lapsed on December 27, 2015.[181] The policyholder had loans outstanding at the time the policy lapsed which resulted in a financial gain on the policy of $770.09.[182]

The policyholder was actively engaged in communication with Tower around the time this policy terminated.

---

[175] TOWER029037-051, at TOWER029038.

[176] TOWER028989-998; TOWER029026-036, at TOWER029026; TOWER028999-9013; TOWER029053-063, at TOWER029053.

[177] TOWER029014-022, at TOWER029014.

[178] TOWER029052.

[179] TOWER029024-025.

[180] TOWER029024-025; TOWER028981; TOWER028982; TOWER029052.

[181] TOWER029075.

[182] TOWER029023.

Confidential

**Policy 854675664** was issued on March 28, 1985, with a face amount of $52,000.[183] Tower sent the policyholder a notification of pending lapse as of November 28, 2016 indicating that the cash value of the policy was insufficient to cover the monthly deductions due.[184] On January 25, 2017, the policyholder spoke with Tower related to pre-lapse status of the policy.[185] The policyholder indicated that she was in in contact with a representative related to her options. The policy lapsed on January 28, 2017.[186]

The policyholder was actively engaged in communication with Tower around the time this policy terminated.

**Policy 3607562** was a whole life policy issued on October 27, 2008, with a face amount of $50,000.[187] The policyholder frequently called Tower to take out the maximum loan amount on the policy and used the loans to fund premium payments.[188]

In October 2016, October 2017, and October 2018, Tower sent the policyholder written notice of the policyholder's right to designate the third party designee to receive duplicate notices.[189]

On July 3, 2018, the policyholder stopped the automatic payment from the bank account that was used to fund the policy,[190] which may reflect that the policyholder was preparing to let the policy lapse. On September 20, 2018, the policyholder called Tower to request the maximum loan amount on the policy.[191] On September 24, 2018, Tower processed the request for an additional loan in the amount of $1,238.65, bringing the outstanding loan balance to $13,175.72.[192]

---

[183] TOWER029293-317, at TOWER029294.

[184] TOWER029323.

[185] TOWER029318.

[186] TOWER029323.

[187] TOWER033707-737, at TOWER033709.

[188] TOWER033669; TOWER033670; TOWER033677; TOWER033680; TOWER033686; TOWER033656; TOWER033660; TOWER033765-766; TOWER033773-776.

[189] TOWER033827-830; TOWER033831-834, TOWER033823-826.

[190] TOWER033755-756.

[191] TOWER033656.

[192] TOWER033657-658.

Confidential

On October 8, 2018, Tower sent a Notice of Payment Due to the policyholder, providing notice that the quarterly premium plus loan interest totaling $932 was due on October 27, 2018.[193] On November 29, 2018, Tower provided the policyholder with a Special Courtesy Offer, indicating that the policyholder could pay the overdue amount by December 18, 2018.[194] Tower notified the policyholder in writing that the policy lapsed on January 4, 2019, more than 60 days after premium was due, because the policyholder never paid the amount owed.[195]

The policyholder had a history of taking out the maximum loan amount available on the policy. Eventually the policy lapsed when its cash value was diminished and could no longer cover the premiums due. The policyholder received multiple years of notices of the right to designate a third party designee to receive duplicate notices and received all of the necessary notices related to the lapse.

**Policy 3298494** was a whole life policy issued on April 19, 1994, with a face amount of $30,000.[196] The policyholder frequently made late premium payments.[197] The policyholder requested the loan history on the policy and Tower provided it on March 3, 2016.[198] On March 17, 2016, the policyholder maximized the loan available on the policy by taking an additional loan in the amount of $2,716.62 that increased the loan balance to $8,390.41.[199] On May 31, 2016 the policyholder and a designated third party filled out Tower's Third Party Designation Form; that information was processed by Tower on June 6, 2016.[200] On August 9, 2016 Tower sent the policyholder a letter indicating that there was insufficient cash value to pay the loan interest due and that $218.87 was due by October 9, 2016.[201] On August 22, 2016 a notice of pending lapse was sent to the policyholder and the policyholder's third party representative along

---

[193] TOWER033798-799.

[194] TOWER033838-839; TOWER033841-844.

[195] TOWER033738-740.

[196] TOWER026575-608, at TOWER026575.

[197] TOWER026683-684; TOWER026687-688; TOWER026694-697; TOWER026679-680; TOWER026621-622.

[198] TOWER026529-530.

[199] TOWER026515; TOWER026516.

[200] TOWER026501-504.

[201] TOWER026743.

Confidential

with a special courtesy offer requiring payment to be made by September 9, 2016.[202] The policy lapsed on October 11, 2016.[203]

The policy file indicates that another class policy (policy 3298493), that was not in the random sample, is linked to this policy. This policy followed the same max loan activity on the same dates as policy 3298494 and lapsed on the same day.[204]

The policy file indicates activity towards the termination of this policy with policy loan maximization. The policyholder was also actively engaged in communication with Tower around the time this policy terminated.

**Policy 864375402** was issued on February 3, 1986, with a face amount of $50,000.[205] The policyholder received notices in February 2017, 2018, and 2019 reminding her of her right to designate a third party to receive policy notices.[206] There is evidence of pending lapse notices being sent to an agent.[207] Tower sent the policyholder notifications of pending lapse on March 4, April 3, and May 15, 2019.[208] The policyholder's daughter called Tower in March 2019 following the receipt of the first pending lapse notice to discuss payment.[209] The policyholder made partial premium payments just prior to the lapse[210] but the policy lapsed on July 3, 2019.[211] A policy lapse notice that was sent to the policyholder's daughter was returned to sender.[212]

Following the lapse, the policyholder's daughter called Tower again related to the received lapse notices and was sent instructions for reinstatement, but there is no record of reinstatement.[213] The daughter called a third time in 2019 after the policyholder passed away,

---

[202] TOWER026561-262.

[203] TOWER026498, TOWER026521-526; TOWER026505-509.

[204] TOWER026516.

[205] TOWER025812-837, at TOWER025813.

[206] TOWER025968-971; TOWER025972-975; TOWER025976-979.

[207] TOWER026002; TOWER025998; TOWER025995; TOWER025986.

[208] TOWER025985; TOWER025991; TOWER025997.

[209] TOWER026019.

[210] TOWER025997; TOWER026001; TOWER026007-008.

[211] TOWER026007-008; TOWER026005-006.

[212] TOWER025842-844.

[213] TOWER026020.

Confidential

and was confused about the policy's lapse status despite confirming receipt of pending lapse notices and discussion of reinstatement in earlier calls.[214]

The policyholder's third party representative was actively engaged in communication with Tower around the time this policy terminated and considered reinstatement.

**Policy 894576010** was issued on May 25, 1989, with a face amount of $100,000.[215] Tower sent the policyholder notifications of pending lapse on numerous occasions between January 2012 and September 2015.[216] The policyholder and her agent called Tower on September 4, 2014, acknowledged the frequent receipt of pending lapse notifications, and verbally agreed to pay $65 per month going forward in order to remove the policy from pre-lapse status.[217] The notifications of pending lapse continued, and the policy lapsed on November 25, 2015.[218] Tower discontinued electronic payments from the bank account that was funding the policy on January 5, 2016.[219]

There is nothing in the policy file that indicates a reason why the policyholder elected to terminate the policy, but the policyholder confirmed receipt of frequent pending lapse notifications.

**Policy 894776924** was issued on June 14, 1989, with a face amount of $100,000.[220] In mid-2015, the policyholder called related to a recent premium increase, inquired about potential future premium increases, and expressed his understanding of how the policy worked related to future premium increases.[221] Tower sent the policyholder a notification of pending lapse as of October 14, 2015, indicating that the cash value of the policy was insufficient to cover the

---

[214] TOWER026021.

[215] TOWER029771-790, at TOWER029772.

[216] TOWER029835; TOWER029836; TOWER029837; TOWER029838; TOWER029839; TOWER029841; TOWER029842; TOWER029827; TOWER029828; TOWER029831; TOWER029833; TOWER029834; TOWER029815; TOWER029820; TOWER029821; TOWER029822; TOWER029825; TOWER029826; TOWER029807; TOWER029808; TOWER029809; TOWER029810; TOWER029811; TOWER029813; TOWER029799; TOWER029800; TOWER029801; TOWER029802; TOWER029803; TOWER029804; TOWER029806; TOWER029796; TOWER029797; TOWER029798; TOWER029845; TOWER029846.

[217] TOWER029847.

[218] TOWER029843-844.

[219] TOWER029795.

[220] TOWER029917-935, at TOWER029918.

[221] TOWER029912.

Confidential

monthly deductions due.[222] The policy lapsed on December 14, 2015.[223] The policyholder called on December 21, 2015, was aware that the policy had lapsed and wanted to go over options.[224]

The policyholder was actively engaged in communication with Tower around the time this policy terminated.

**Policy 895077080** was issued on November 1, 1989, with a face amount of $25,000.[225] Tower sent the policyholder notifications of pending lapse five times between July 2013 and January 2016 indicating that the cash value of the policy was insufficient to cover the monthly deductions due.[226] The policyholder called on August 29, 2014, to discuss premium payments and expressed that the policy was becoming unaffordable. The policyholder also acknowledged receipt of pending lapse letters during this call.[227] The policy lapsed on March 2, 2016.[228]

On March 15, 2016, Tower responded to the policyholder's request for reinstatement information with the appropriate forms that were also sent to a third party.[229] There is no indication that the policyholder attempted to reinstate.

The policyholder was actively engaged in communication with Tower around the time this policy terminated and considered reinstatement.

**Policy 864476078** was issued on May 22, 1986, with a face amount of $50,000.[230] The policyholder completed the third party notification form as of August 10, 2015.[231] Tower sent the policyholder notifications of pending lapse in April and May 2018 indicating that the cash value of the policy was insufficient to cover the monthly deductions due.[232] Tower stopped electronic payments from the bank account funding the policy on June 26, 2018, prior to the lapse.[233] The

---

[222] TOWER029952.

[223] TOWER029953.

[224] TOWER029910.

[225] TOWER029955-970, at TOWER029956.

[226] TOWER030088; TOWER030085; TOWER030091; TOWER029994; TOWER029979.

[227] TOWER030120.

[228] TOWER030011.

[229] TOWER030012-017, at TOWER030012-013; TOWER030030-035, at TOWER030030-031.

[230] TOWER034748-767, at TOWER034749.

[231] TOWER034774-775; TOWER034776-777.

[232] TOWER034993; TOWER035002.

[233] TOWER035004-005.

Confidential

policy lapsed on July 23, 2018. A third party representative also received this notice.[234] As of the lapse date, the policyholder had an outstanding loan on the policy of $15,681.06.[235] Based on the policyholder's net investment in the policy, the loan resulted in a taxable gain of $3,741.06.[236]

The policyholder's husband called Tower in January 2020 acknowledging the policy lapsed two years prior and requested information to reinstate the policy.[237] Tower sent the appropriate forms to the policyholder.[238] The reinstatement letter was also sent to an agent.[239]

The policyholder was aware this policy had been terminated and considered reinstatement.

**Policy 907030422** was issued on January 8, 1991, with a face amount of $25,000.[240] On December 7, 2015, the policyholder contacted Tower and acknowledged that the policy would "run out by the end of next year" if premium wasn't paid.[241] Tower had a conversation with the policyholder on August 29, 2016, in which the policyholder was informed that the policy would move into lapse pending status if a premium payment was not received by September 8, 2016.[242] The policyholder intended to make the payment but never did.[243] Tower left the policyholder a voicemail related to the pre-lapse status on the policy on October 27, 2016.[244] The policy lapsed on November 8, 2016.[245] The policyholder inquired about reinstatement shortly after the lapse but did not proceed with it.[246]

The policyholder was actively engaged in communication with Tower around the time this policy terminated and considered reinstatement.

---

[234] TOWER035006-007; TOWER035008-009.

[235] TOWER035010-011.

[236] TOWER035010-011.

[237] TOWER034778.

[238] TOWER034779; TOWER034802-817, at TOWER034807.

[239] TOWER034802-817, at TOWER034802.

[240] TOWER037670-685, at TOWER037671.

[241] TOWER037668.

[242] TOWER037803; TOWER037669.

[243] TOWER037669.

[244] TOWER037799-802.

[245] TOWER037940.

[246] TOWER037770; TOWER037947-952, at TOWER037948.

Confidential

**Policy 106116695** was issued on October 9, 1990, with a face amount of $200,000.[247] The policyholder requested and received information on policy status, in-force quotes and premium changes within the year prior to lapse.[248] The policy lapsed by January 14, 2014.[249]

The policyholder was actively engaged in communication with Tower around the time this policy terminated.

**Policy 845176077** was issued on December 4, 1984, with a face amount of $100,000.[250] The cash value of policy became insufficient to cover premiums and it lapsed on November 4, 2013.[251] The policyholder called Tower after the lapse on January 24, 2014, and discussed options related to policy reinstatement.[252]

The policyholder was actively engaged in communication with Tower around the time this policy terminated and considered reinstatement.

**Policy 865175006** was issued on January 5, 1987, with a face amount of $25,000.[253] The policyholder was sent numerous pending lapse notices within the year before the ultimate lapse (each month from Nov 2016 - Jun 2017).[254] According to a call made on April 21, 2016, the policyholder's daughter helped with bills.[255] The policyholder called on December 29, 2016, requesting a premium draft taken from her account be returned as it had overdrawn her account.[256] The policyholder requested a decrease to the premium on February 14, 2017, six months prior to the lapse.[257] The policy carried a large loan and the cash value was insufficient to cover premiums at time of lapse on August 5, 2017. [258]

---

[247] TOWER025430; TOWER025441-475, at TOWER025443.

[248] TOWER025430; TOWER025344-346; TOWER025416; TOWER025417; TOWER025325; TOWER025365; TOWER025436-440; TOWER025360-362; TOWER025330-331.

[249] TOWER025476-493, at TOWER025492-493.

[250] TOWER026339-355, at TOWER026340.

[251] TOWER026362; TOWER026363-364.

[252] TOWER026366-367; TOWER026356-360.

[253] TOWER026026-045, at TOWER026027.

[254] TOWER026141; TOWER026152; TOWER026088; TOWER026070; TOWER026236; TOWER026187; TOWER026165; TOWER026176.

[255] TOWER026052.

[256] TOWER026054; TOWER026266.

[257] TOWER026109-111.

[258] TOWER026198; TOWER026187; TOWER026200; TOWER026199.

**Confidential**

There is evidence of a reinstatement attempt after lapse, with the payment of a $100 reinstatement fee, but the file indicates that amount was refunded.[259] Tower stopped electronic payments from the bank account that was funding the policy on September 7, 2017.[260]

The policyholder was actively engaged in communication with Tower around the time this policy terminated and considered reinstatement.

**Policy 865176132** was issued on December 22, 1986, with a face amount of $50,000.[261] The policyholder called Tower on August 12, 2015, related to a payment required by September 25, 2015, to prevent lapse.[262] The policyholder asked Tower about the potential to transfer ownership of the policy.[263] The policyholder explained that she was getting divorced from her husband and would let him decide whether or not to retain the policy.[264] The policy lapsed on January 22, 2017.

The policyholder was actively engaged in communication with Tower around the time this policy terminated.

**Policy 874175217** was issued on February 4, 1987, with a face amount of $150,000.[265] The policy file includes a screen shot dated March 31, 2017 (during the grace period) that confirms a call with the policyholder occurred.[266] The policyholder stated that he could no longer afford the insurance and was going to let the policy lapse but wanted to discuss any options that existed.[267] The policy lapsed on April 6, 2017.

The policyholder was actively engaged in communication with Tower around the time this policy terminated.

---

[259] TOWER026046-050.

[260] TOWER026214-215.

[261] TOWER035092-110, at TOWER035093.

[262] TOWER035091; TOWER035112.

[263] TOWER035091.

[264] TOWER035091.

[265] TOWER035796-816, at TOWER035797.

[266] TOWER035825.

[267] TOWER035825.

Confidential

**Policy 905075188** was issued on November 1, 1990, with a face amount of $25,000.[268] The cash value of policy became insufficient to cover premium amounts due.[269] The policy lapsed on January 1, 2013.[270] Following the lapse, the policyholder inquired about reinstatement frequently in 2013 and sent in $75 dollar checks on multiple occasions that were insufficient for reinstatement.[271] Tower refunded these payments to the policyholder.[272]

The policyholder was actively engaged in communication with Tower around the time this policy terminated and considered reinstatement.

**Policy 884977331** was issued on October 17, 1988, with a face amount of $106,000.[273] The policy file indicates that EFT drafting was stopped and a change in address request was received in February 2016.[274] The cash value of the policy became insufficient to cover premium payments and the policy lapsed on April 18, 2016.[275]

The policyholder was actively engaged in communication with Tower around the time this policy terminated.

**Policy 884776622** was issued on July 5, 1988, with a face amount of $50,000.[276] After receiving the lapse notification, the policyholder called Tower and explained that she did not know about the policy because her husband purchased the policy in her name without her knowledge.[277] The husband had taken five loans against policy while it was active.[278] The cash

---

[268] TOWER036650-685, at TOWER036651.

[269] TOWER036748-749.

[270] TOWER036748-749.

[271] TOWER036750-755, at TOWER036751; TOWER036786-807, at TOWER036787; TOWER036958-963, at TOWER036959; TOWER037000-005, at TOWER037001; TOWER037048-069, at TOWER037050; TOWER037204-225, at TOWER037205; TOWER037336-357, at TOWER037337; TOWER037512-533, at TOWER037513; TOWER036686-693, at TOWER036686-693; TOWER036694; TOWER036695; TOWER036696; TOWER036697; TOWER036698; TOWER036699; TOWER036700; TOWER036701.

[272] TOWER036686-693, at TOWER036686-693; TOWER036694; TOWER036695; TOWER036696; TOWER036697; TOWER036698; TOWER036699; TOWER036700; TOWER036701.

[273] TOWER036007-023, at TOWER036008.

[274] TOWER036024-025; TOWER036026-028.

[275] TOWER036033; TOWER036034-035.

[276] TOWER035917-936, at TOWER035918.

[277] TOWER035954; TOWER035916; TOWER036002-003; TOWER036004.

[278] TOWER035916; TOWER036005-006; TOWER035967.

**Confidential**

value of the policy became insufficient to cover premium payments and the policy lapsed on August 5, 2016.[279]

The policyholder was actively engaged in communication with Tower around the time this policy terminated.

**Policy 874475136** was issued on April 7, 1987, with a face amount of $50,000.[280] The policyholder cured numerous instances of pending lapse throughout the policy life.[281] The pending lapse notices were sent to both the policyholder and third party representative who was designated as the third party in 2015.[282] The policyholder's representative called Tower on October 22, 2015 related to missed premium payments from 2006 – 2010 and complained about the lack of appropriate notification.[283] The Tower representative explained that Tower sends notices out if the cash value of policy becomes too low to cover premium payments due.[284] The policyholder stopped automatic payments on September 11, 2015, the month of a missed payment.[285] The policyholder's third party representative called Tower on October 21, 2015, during the lapse pending stage, asking for a reinstatement quote.[286] The third party called numerous times in 2015 on behalf of the policyholder making various requests related to the policy.[287] The policy lapsed on November 7, 2015.[288]

The policyholder was actively engaged in communication with Tower around the time this policy terminated and considered reinstatement.

**Policy 873275123** was issued on December 14, 1987, with a face amount of $100,000.[289] Tower frequently sent the policyholder notifications of pending lapse because of missed

---

[279] TOWER036002-003; TOWER035998.

[280] TOWER026368-385, at TOWER026369.

[281] TOWER026442; TOWER026452; TOWER026453; TOWER026421; TOWER026414; TOWER026458.

[282] TOWER026452; TOWER026458; TOWER026473-474.

[283] TOWER026495.

[284] TOWER026495.

[285] TOWER026460-461.

[286] TOWER026490.

[287] TOWER026490; TOWER026491; TOWER026492; TOWER026494.

[288] TOWER026398-399.

[289] TOWER035775-776. Note:  There are no documents with the issue date in the policy file. The issue date was determined based on an inquiry to Tower.

Confidential

premium payments.[290] The policy had also previously been reinstated.[291] The cash value of the policy became insufficient to cover amounts due and the policy lapsed on February 13, 2016.[292]

On February 22, 2016, the spouse of the policyholder called Tower after the final lapse and complained that he had not received notices in the few months prior to lapse.[293] Tower confirmed to the spouse of the policyholder that the notification of pending lapse was sent to the correct address.[294] The policyholder was interested in reinstatement.[295] The policyholder applied for reinstatement, but it was denied by Tower because the policyholder requested a premium payment of $38 that didn't meet the $100 minimum requirement.[296]

The spouse called again on June 2, 2016, because the reinstatement application was denied.[297] The Tower rep explained that due to the policyholder change to monthly billing, there was a minimum $100 monthly premium requirement.[298] There is evidence in the policy file that the spouse called two other times, on October 20, 2016 and July 9, 2017, requesting reinstatement quotes.[299] The proper forms were sent to her numerous times as detailed in the policy file, but there is no evidence that another reinstatement application was sent in after the first one was denied.[300]

The policyholder was actively engaged in communication with Tower around the time this policy terminated and considered reinstatement.

### 3.   Additional Individual Inquiry Required of Policyholders

For 26 of the non-term policies included in the random sample, the policy files provide no indication of a reason why the policyholder decided to terminate the policy or let it lapse.

---

[290] TOWER035566; TOWER035783; TOWER035387; TOWER035565; TOWER035290; TOWER035166.

[291] TOWER035169-170; TOWER035171-173.

[292] TOWER035174.

[293] TOWER035161; TOWER035145.

[294] TOWER035145.

[295] TOWER035145.

[296] TOWER035159-160; TOWER035275-277.

[297] TOWER035162; TOWER035146.

[298] TOWER035146.

[299] TOWER035163; TOWER035164-165; TOWER035150.

[300] TOWER035567-582, at TOWER035572; TOWER035389-404, at TOWER035394; TOWER035179-184, at TOWER035183; TOWER035291-296, at TOWER0351295.

Confidential

There is nothing that can be inferred one way or the other related to the termination or lapse of the policy. In these instances, the cash value of the policy became insufficient to cover required premiums and the policy ultimately lapsed. The policy files include no record of policyholders, or third parties, actively communicating with Tower around the time of lapse even as notifications were sent. For all of these policies, individual inquiry would be required to determine the intent of the policyholder related to the policy.

For 3 of these 26 policies, the policy files provide no indication of a reason why the policy ultimately lapsed but the policy file does include documentation of previous reinstatement of the policy due to lapse. Given the reinstatement activity around the time of earlier lapses and subsequent reinstatements, it is evident that these particular policyholders received and acted upon lapse notifications from Tower during the proposed class period. These three policies are discussed first below.

**Policy 841177330** was issued on December 3, 1984, with a face amount of $50,000.[301] Beginning in 2012 and going through 2016, the policyholder was frequently late on making premium payments. As a result, Tower sent numerous notifications of pending lapse indicating that the cash value of the policy was insufficient to cover the monthly deductions due (at least 17 instances).[302] The first pending lapse notification was sent on April 3, 2012.[303] The policy lapsed three times during its life resulting in three reinstatements by the policyholder as presented in the table below.

**Policy 84177330**
**Reinstatement History[304]**

| Lapse Date | Reinstatement Date |
| --- | --- |
| September 3, 2013 | November 14, 2013 |
| February 2, 2016 | March 9, 2016 |
| July 5, 2016 | July 25, 2016 |

---

[301] TOWER034640-663, at TOWER034641.

[302] TOWER034699; TOWER034705; TOWER034721; TOWER034737; TOWER034698; TOWER034700; TOWER034706; TOWER034701; TOWER034707; TOWER034722; TOWER034738; TOWER034697; TOWER034704; TOWER034720; TOWER034739; TOWER034702; TOWER034723.

[303] TOWER034699.

[304] TOWER034718-719; TOWER034730-732; TOWER034690; TOWER034694; TOWER034708-709; TOWER034710-712.

Confidential

A notification of pending lapse was sent on October 3, 2016,[305] and the policy ultimately lapsed as of December 5, 2016.[306]

There is nothing in the policy file that indicates a reason why the policyholder elected to terminate the policy.

**Policy 895176152** was issued on January 16, 1989, with a face amount of $100,000.[307] Beginning in June 2012 and going through 2013, the policyholder was frequently late on making premium payments. As a result, Tower sent numerous notifications of pending lapse indicating that the cash value of the policy was insufficient to cover the monthly deductions due (at least 5 instances).[308] The policy lapsed three times during its life resulting in three reinstatements by the policyholder as presented in the table below.

**Policy 895176152**
**Reinstatement History[309]**

| Lapse Date | Reinstatement Date |
|---|---|
| August 16, 2012 | August 21, 2012 |
| January 16, 2013 | February 5, 2013 |
| June 17, 2013 | October 8, 2013 |

As of March 29, 2013, the policyholder was actively communicating with Tower related to the premium payments.[310] A notification of pending lapse was sent on December 16, 2013,[311] and the policy ultimately lapsed as of February 18, 2014.[312]

There is nothing in the policy file that indicates a reason why the policyholder elected to terminate the policy.

**Policy 855075325** was a universal life policy that was issued on December 16, 1985, with a face amount of $50,000.[313] Beginning in January 2012 and continuing through 2018, the

---

[305] TOWER034723.

[306] TOWER034740.

[307] TOWER036162-180, at TOWER036163.

[308] TOWER036230; TOWER036322; TOWER036325; TOWER036229.

[309] TOWER036288-290; TOWER036218-220; TOWER036319-321; TOWER036231-232; TOWER036195-196; TOWER036286-287.

[310] TOWER036225-228.

[311] TOWER036325.

[312] TOWER036221-222.

[313] TOWER029331-347, at TOWER029332.

Confidential

policyholder was frequently late on making premium payments. As a result, Tower sent numerous notifications of pending lapse indicating that the cash value of the policy was insufficient to cover the monthly deductions due (at least 24 instances).[314]

The policy lapsed three times during its life resulting in three reinstatements by the policyholder as presented in the table below.

**Policy 855075325**
**Reinstatement History[315]**

| Lapse Date | Reinstatement Date |
|---|---|
| November 16, 2015 | February 24, 2016 |
| September 15, 2016 | October 19, 2016 |
| January 17, 2017 | February 16, 2017 |

As the above indicates, the policyholder reinstated twice in 2016 and once in 2017. After continuing to regularly fall behind on payments in 2018, the policyholder eventually failed to make his July 16, 2018 premium payment.

On May 21, 2018, Tower sent the policyholder a Notification of Pending Lapse to the policyholder, requiring a payment of $704.89 by July 16, 2018 in order to retain coverage.[316] On June 11, 2018, Tower sent a Notification of Pending Lapse to the policyholder, requiring a payment of $604.56 on or before July 16, 2018 in order to retain coverage.[317] On July 11, 2018, Tower sent a Notification of Pending Lapse to the policyholder, requiring a payment of $764.71 by August 16, 2018 in order to retain coverage.[318] Then, finally, on August 16, 2018, Tower sent the policyholder a Notice of Policy Lapse, providing information as to why the policy lapsed and additional information on how to reinstate the policy.[319]

There is nothing in the policy file that indicates a reason why the policyholder ultimately elected to terminate the policy; however, the policyholder received ten different lapse-related notices over the life of the policy, indicating that the policyholder was likely aware and

---

[314] TOWER029363; TOWER029397; TOWER029539; TOWER029364; TOWER029541; TOWER029498; TOWER029361; TOWER029499; TOWER029481; TOWER029509; TOWER029431; TOWER029467; TOWER029482; TOWER029508; TOWER029399; TOWER029497; TOWER029439; TOWER029530; TOWER029532; TOWER029391; TOWER029440; TOWER029480

[315] TOWER029528-529; TOWER029403-405; TOWER029553-554; TOWER029388; TOWER029355-356; TOWER029516.

[316] TOWER029454.

[317] TOWER029465.

[318] TOWER029480.

[319] TOWER029494-495.

Confidential

ultimately made an informed decision not to make the past-due payment or otherwise apply for reinstatement. Based on the policyholder's historical reinstatement activity, it is safe to say that he was familiar with the process and could have pursued reinstatement if he desired to keep the policy in force.

**Policy 874576372** was issued on June 1, 1987, with a face amount of $50,000.[320] A notification of pending lapse was sent on July 1, 2014,[321] and the policy ultimately lapsed as of August 31, 2014, with an outstanding loan balance of $25,075.54.[322] Based on the policyholder's investment in the policy, a taxable gain of $8,300.54 was realized.[323]

The daughter of the policyholder called Tower in 2019, after the policyholder died because she was informed that her father had policies with MetLife, one of which lapsed. The daughter called Tower related to the policies and the representative confirmed that one policy had lapsed in 2014 and one was still active. The representative went through steps to have ownership of the active policy transferred to her.[324]

There is nothing in the policy file that indicates a reason why the policyholder may have elected to terminate the policy or let the policy lapse.

**Policy 844886021** was issued on August 27, 1984, with a face amount of $85,000.[325] The policyholder was an insurance agent who had been carrying a loan on the policy for several years.[326] The policy file indicates that a third party was added to the policy as of August 2015.[327] As of August 2016, the policy carried a loan balance of approximately $23,000.[328] The policy file indicated that the policyholder made numerous late payments and received notifications of

---

[320] TOWER029570-592, at TOWER029571.

[321] TOWER029631.

[322] TOWER029644.

[323] TOWER029644.

[324] TOWER029666.

[325] TOWER029171-183, at TOWER029172.

[326] TOWER029196; TOWER029108; TOWER029100; TOWER029103; TOWER029105; TOWER029093; TOWER029096; TOWER029168; TOWER029132; TOWER029135; TOWER029136; TOWER029141; TOWER029131.

[327] TOWER029169-170.

[328] TOWER029145-146.

**Confidential**

pending lapses on multiple occasions.[329] A notification of pending lapse was sent on March 27, 2017,[330] and the policy ultimately lapsed as of May 27, 2017.[331]

There is nothing in the policy file that indicates a reason why the policyholder elected to terminate the policy.

**Policy 835285292** was issued on November 3, 1983, with a face amount of $50,000.[332] The cash value of policy became insufficient to cover premiums in 2012.[333] In 2012, the policyholder rectified paid past-due premium amounts on multiple occasions to keep the policy in force:

- First, on February 3, 2012, Tower sent the policyholder a Notification of Pending Lapse, indicating that $177.90 in premium was required by April 4, 2012 to maintain coverage.[334]

- On March 29, 2012, Tower sent the policyholder notification that a payment of $920 was due on or before May 3, 2012.[335]

- On June 4, 2012, Tower sent the policyholder a Notice of Pending Lapse, notifying policyholder that a payment of $147.45 was required by August 3, 2012 in order to retain coverage.[336]

- On November 5, 2012, Tower sent the policyholder a Notification of Pending Lapse, notifying the policyholder that a payment of $185.71 was due on or before January 3, 2013 in order to retain coverage.[337]

The policyholder was responsive to these 2012 notices and the policy remained in force. On March 4, 2013, Tower sent the policyholder a notification of pending lapse with premium due on May 3, 2013.[338] However, this time the policyholder never made the payment. The policy

---

[329] TOWER029108; TOWER029100; TOWER029103; TOWER029105; TOWER029093; TOWER029096; TOWER029168; TOWER029132; TOWER029135; TOWER029136; TOWER029141; TOWER029131.

[330] TOWER029108.

[331] TOWER029137-138.

[332] TOWER025494-510, at TOWER025495.

[333] TOWER025514.

[334] TOWER025514.

[335] TOWER025516-517.

[336] TOWER025520.

[337] TOWER025523.

[338] TOWER025515.

Confidential

lapsed on May 3, 2013. On May 3, 2013, Tower sent a Notice of Policy Lapse to policyholder, notifying policyholder of the lapse and providing information on how to reinstate the policy.[339]

There is nothing in the policy file that indicates a reason why the policyholder elected to terminate the policy. Importantly, however, the history of lapse-related notices indicates that policyholder was responsive to notices sent by Tower.

**Policy 894177313** was issued on February 6, 1989, with a face amount of $50,000.[340] As of February 2015 the policy had an outstanding loan balance of $2,358.22.[341] The cash value of policy became insufficient to cover the monthly deductions and Tower sent the policyholder notifications of pending lapse on multiple occasions.[342] A notification of pending lapse was sent on December 7, 2015[343] and the policy ultimately lapsed as of February 5, 2016.[344] On March 16, 2016, Tower discontinued automatic payments that were less than the amount due from the bank account that had been used to fund the policy.[345]

There is nothing in the policy file that indicates a reason why the policyholder may have elected to terminate the policy or let the policy lapse.

**Policy 894275882** was issued on March 20, 1989, with a face amount of $50,000.[346] As of March 2014 the policy had an outstanding loan balance of $6,787.70.[347] The cash value of policy became insufficient to cover the monthly deductions and Tower sent the policyholder notifications of pending lapse on multiple occasions.[348] A notification of pending lapse was sent on August 15, 2014[349] and the policy ultimately lapsed as of October 20, 2014.[350] On November

---

[339] TOWER025518-519.

[340] TOWER026289-316, at TOWER026290. The face amount was increased in 1993 per the contract.

[341] TOWER026337.

[342] TOWER026333; TOWER026325; TOWER026327.

[343] TOWER026334.

[344] TOWER026323.

[345] TOWER026326.

[346] TOWER029695-716, at TOWER029696. The face amount was increased in 1992 per the contract.

[347] TOWER029723-724.

[348] TOWER029727; TOWER029728; TOWER029729; TOWER029732.

[349] TOWER029729.

[350] TOWER029734-735.

Confidential

17, 2014 Tower discontinued automatic payments that were less than the amount due from the bank account that was funding the policy.[351]

There is nothing in the policy file that indicates a reason why the policyholder may have elected to terminate the policy or let the policy lapse.

**Policy 106013447** was issued on March 14, 1985, with a face amount of $50,000.[352] As of March 2013, the policy had an outstanding loan balance of $1,811.13.[353] Tower sent the policyholder and her representative grace period and pending lapse notices indicating that the cash value was insufficient to cover the monthly deductions due.[354] The policy file indicates that Tower was unable to locate the policyholder even though notices were being sent to both the policyholder and a representative.[355] A notification of pending lapse was sent on March 15, 2013[356]and the policy ultimately lapsed as of May 15, 2013.[357] The policyholder and her representative were sent a notice on June 10, 2013, indicating that her lapsed policy had no taxable gain.[358]

There is nothing in the policy file that indicates a reason why the policyholder may have elected to terminate the policy or let the policy lapse.

**Policy 106123626** was issued on March 1, 1993, with a face amount of $46,026.[359] Tower sent the policyholder and her representative grace period and pending lapse notices explaining that the cash value was insufficient to cover the monthly deductions due.[360] A

---

[351] TOWER029736.

[352] TOWER030242-274, at TOWER030242.

[353] TOWER030139-142.

[354] TOWER030200; TOWER030223-226; TOWER030232-233.

[355] TOWER030136; TOWER030137-138; TOWER030150; TOWER030236.

[356] TOWER030227-229.

[357] TOWER030135; TOWER030236; TOWER030227-229.

[358] TOWER030130-134; TOWER030238-240.

[359] TOWER030368-404, at TOWER030369, TOWER030374.

[360] TOWER030353-355; TOWER030360-362; TOWER030277-280; TOWER030281-283.

**Confidential**

notification of pending lapse was sent on December 2, 2013,[361] and the policy ultimately lapsed as of February 8, 2014.[362] The policy lapse notice was also sent to the agent.[363]

There is nothing in the policy file that indicates a reason why the policyholder may have elected to terminate the policy or let the policy lapse.

**Policy 845175548** was issued on October 20, 1984, with a face amount of $50,000.[364] The cash value of the policy eventually became insufficient to cover the monthly deductions due. A notification of pending lapse was sent on October 20, 2014,[365] and the policy lapsed as of December 21, 2014.[366]

There is nothing in the policy file that indicates a reason why the policyholder may have elected to terminate the policy or let the policy lapse.

**Policy 845176371** was issued on November 25, 1984, with a face amount of $50,000.[367] Tower sent the policyholder notices in November 2016 and 2017 reminding him of his right to designate a third party to receive duplicate notices, but there is no evidence a third party was selected.[368] The cash value of the policy eventually became insufficient to cover the monthly deductions due. A notification of pending lapse was sent on February 26, 2018,[369] and the policy lapsed as of April 27, 2018.[370]

There is nothing in the policy file that indicates a reason why the policyholder may have elected to terminate the policy or let the policy lapse.

---

[361] TOWER030353-355.

[362] TOWER030289.

[363] TOWER030290-292.

[364] TOWER029198-213, at TOWER029199.

[365] TOWER029216.

[366] TOWER029221-222.

[367] TOWER029248-269, at TOWER029249.

[368] TOWER029239-242; TOWER029243-246.

[369] TOWER029223.

[370] TOWER029225-226.

Confidential

**Policy 842225818** was issued on February 27, 1984, with a face amount of $50,000.[371] The cash value of the policy eventually became insufficient to cover the monthly deductions due. A notification of pending lapse was sent,[372] and the policy lapsed as of March 31, 2014.[373]

There is nothing in the policy file that indicates a reason why the policyholder may have elected to terminate the policy or let the policy lapse.

**Policy 862146637** was issued on January 24, 1986, with a face amount of $50,000.[374] Tower sent the policyholder pending lapse notifications on multiple occasions indicating that the cash value of the policy was insufficient to cover the monthly deductions due.[375] A notification of pending lapse was sent on November 24, 2014[376] and the policy ultimately lapsed as of January 24, 2015.[377] Tower discontinued automatic payments that were less than the amount due from the bank account that was funding the policy on February 12, 2015.[378]

There is nothing in the policy file that indicates a reason why the policyholder may have elected to terminate the policy or let the policy lapse.

**Policy 884476998** was issued on April 24, 1988, with a face amount of $135,000.[379] The cash value of the policy eventually became insufficient to cover the monthly deductions due. A notification of pending lapse was sent on January 26, 2015 [380] The policy lapsed as of March 26, 2015.[381]

There is nothing in the policy file that indicates a reason why the policyholder may have elected to terminate the policy or let the policy lapse.

---

[371] TOWER028948-967, at TOWER028949.

[372] TOWER028975.

[373] TOWER028976-977.

[374] TOWER025607-623, at TOWER025608.

[375] TOWER025630; TOWER025632; TOWER025634; TOWER025640.

[376] TOWER025634.

[377] TOWER025627-628.

[378] TOWER025629.

[379] TOWER029667-685, at TOWER029668.

[380] TOWER029686.

[381] TOWER029689-690.

Confidential

**Policy 106213707** was issued as of April 20, 1999, with a face amount of $500,000 at the time of lapse.[382] Tower sent the policyholder notices in April 2016 and 2017, reminding him of his right to designate a third party to receive duplicate notices.[383] Tower sent the policyholder and his representative grace period and pending lapse notices indicating that the cash value was insufficient to cover the monthly deductions due.[384] A notification of pending lapse was sent on September 20, 2017,[385] and the policy ultimately lapsed as of January 27, 2018.[386] The representative also received a copy of the policy lapse notice.[387]

There is nothing in the policy file that indicates a reason why the policyholder may have elected to terminate the policy or let the policy lapse.

**Policy 106216761** was issued on September 6, 2001, with a face amount of $1,000,000.[388] Tower sent the policyholder a notice in September 2016 reminding him of his right to designate a third-party representative to receive duplicate notices.[389] The cash value of the policy eventually became insufficient to cover the monthly deductions due, and Tower sent the policyholder and his representative grace period notices in July 2016.[390] A grace period notice was sent on October 6, 2016,[391] and the policy ultimately lapsed as of December 10, 2016.[392] The representative also received a copy of the policy lapse notice.[393]

There is nothing in the policy file that indicates a reason why the policyholder may have elected to terminate the policy or let the policy lapse.

---

[382] TOWER030462-466.

[383] TOWER030423-426; TOWER030427-430.

[384] TOWER030523; TOWER030527-529; TOWER030530-531; TOWER030532-535.

[385] TOWER030527-529.

[386] TOWER030405.

[387] TOWER030406-408.

[388] TOWER030742-777, at TOWER030742.

[389] TOWER030706-709.

[390] TOWER030602-605; TOWER030594-595.

[391] TOWER030710-711; TOWER030712-715.

[392] TOWER030741.

[393] TOWER030738-740.

Confidential

**Policy 106768896** was issued on October 28, 2004, with a face amount of $100,000.[394] The cash value of the policy eventually became insufficient to cover the monthly deductions due. A grace period notice was sent on April 28, 2016[395] and the policy ultimately lapsed as of July 2, 2016.[396] The representative also received a copy of the policy lapse notice.[397]

There is nothing in the policy file that indicates a reason why the policyholder may have elected to terminate the policy or let the policy lapse.

**Policy 834455063** was issued on April 14, 1983, with a face amount of $50,000.[398] There is evidence of a few notices of payment and a pending lapse notice being returned to sender.[399] According to the policy file, Tower had trouble locating the best address for several years.[400] Two addresses were used, one prior to early 2015 and one from early 2015 onward, but both have evidence of correspondences being returned to sender.[401] A Tower letter dated March 25, 2015, was sent to the policyholder related to undelivered correspondence, listing the better address they located, and requesting action if it is incorrect.[402] There is no evidence of any response. The pending lapse letter was returned to Tower and included a written note on the envelope that reads "Wrong addressee, not the correct Callahan."[403] There is a policy lapse notice on file, but it uses the same address as the pending lapse letter.[404] The policy file indicates that as of February 22, 2018 (a month before the lapse), Tower was unable to locate a better address.[405] The cash value of the policy eventually became insufficient to cover the monthly

---

[394] TOWER031124-126.

[395] TOWER031042-043.

[396] TOWER031068; TOWER030982.

[397] TOWER031069-071.

[398] TOWER034559-575, at TOWER034560.

[399] TOWER034588-590; TOWER034576-579; TOWER034580-583.

[400] TOWER034591.

[401] TOWER034588-590; TOWER034576-579; TOWER034580-583.

[402] TOWER034627.

[403] TOWER034588-590.

[404] TOWER034623-624.

[405] TOWER034591.

Confidential

deductions due. A notification of pending lapse was sent on January 16, 2018, [406] and the policy lapsed as of March 16, 2018.[407]

There is nothing in the policy file that indicates a reason why the policyholder may have elected to terminate the policy or let the policy lapse.

**Policy 854576241** was issued on July 15, 1985, with a face amount of $50,000.[408] The cash value eventually became insufficient to cover the monthly deductions due. A notification of pending lapse was sent on February 15, 2013,[409] and the policy lapsed as of April 17, 2013.[410]

There is nothing in the policy file that indicates a reason why the policyholder may have elected to terminate the policy or let the policy lapse.

**Policy 875215276** was issued as of December 26, 1987, with a face amount of $25,000.[411] A letter in the policy file indicated that Tower was having problems locating a proper address for the policy as of March 24, 2014.[412] There is no indication in the policy file as to whether this was resolved. The cash value of the policy eventually became insufficient to cover the monthly deductions due. A notification of pending lapse was sent on February 26, 2018,[413] and the policy lapsed as of April 28, 2018.[414]

There is nothing in the policy file that indicates a reason why the policyholder may have elected to terminate the policy or let the policy lapse.

**Policy 865076511** was issued as of November 3, 1986, with a face amount of $60,000.[415] The cash value of the policy eventually became insufficient to cover the monthly deductions due.

---

[406] TOWER034610.

[407] TOWER034623-624.

[408] TOWER029270-286, at TOWER029271.

[409] TOWER029287.

[410] TOWER029289.

[411] TOWER035861-880, at TOWER035862.

[412] TOWER035884.

[413] TOWER035881.

[414] TOWER035885.

[415] TOWER035037-057, at TOWER035038.

Confidential

A notification of pending lapse was sent on August 3, 2016, [416] and the policy lapsed as of October 3, 2016.[417]

There is nothing in the policy file that indicates a reason why the policyholder may have elected to terminate the policy or let the policy lapse.

**Policy 3423563** was issued on November 1, 2003, with a face amount of $50,000.[418] The policyholder was five years old at the time it was issued.[419] The policyholder was the mother of the insured. She frequently missed premium payments and took out multiple loans on policy.[420] On May 26, 2010, the policyholder called Tower interested in surrendering the policy.[421] The cash value of policy became insufficient to pay premiums and the policyholder received multiple special courtesy offers within the year prior to lapse.[422] A special courtesy offer was sent on December 4, 2013,[423] and the policy lapsed as of January 7, 2014.[424]

There is nothing in the policy file that indicates a reason why the policyholder may have elected to terminate the policy or let the policy lapse.

**Policy 895275562** was issued on January 13, 1990, with a face amount of $30,769.[425] Tower sent the policyholder a notice in January 2017, 2018 and 2019, reminding her of her right to designate a third party to receive duplicate notices.[426] The cash value of the policy eventually became insufficient to cover premium payments. A notification of pending lapse was sent on January 14, 2019, [427] and the policy lapsed on March 15, 2019.[428] The notice of policy lapse was

---

[416] TOWER035079.

[417] TOWER035089-090.

[418] TOWER033513-546, at TOWER033513.

[419] TOWER033513-546, at TOWER033513.

[420] TOWER033627-628; TOWER033633-634; TOWER033581-582; TOWER033557-558; TOWER033492-496; TOWER033497-499

[421] TOWER033508.

[422] TOWER033555-556; TOWER033575-576; TOWER033595-596; TOWER033625-626.

[423] TOWER033633-634.

[424] TOWER033547.

[425] TOWER036329-346, at TOWER036330. In 1997 the face amount was decreased to $30,169 per the contract.

[426] TOWER036383-386; TOWER036388-391; TOWER036392-395.

[427] TOWER036387.

[428] TOWER036326-328.

**Confidential**

returned to Tower.[429] The policy file indicates that Tower was unable to find a current address.[430] The same address had been used for the prior decade and there was no evidence any previous address problems.[431]

There is nothing in the policy file that indicates a reason why the policyholder may have elected to terminate the policy or let the policy lapse.

**Policy 106603635** was issued on April 5, 2005, with a face amount of $1,150,000.[432] The policy lapsed on August 16, 2018.[433] The policy file includes documentation of address problems in the four years prior to the policy lapse with many notices returned to Tower, including third-party designee forms sent in 2017 and 2018.[434] The policy file indicates Tower attempted many times to find a better address but was unable to.[435]

A trustee affiliated with the policy called Tower on December 26, 2014, to discuss a typo in the address, but it does not appear to have impacted the delivery of notices.[436] Tower sent a letter to the policyholder's address on June 6, 2017, and received correspondence received from the US Post Office related to help finding a better address. A response to this letter also was sent back to Tower by a member of the policyholder's family with contact information for the family member. Handwritten notes on the letter indicate that Tower would not contact the family member because the insured did not make the request.[437]

There is nothing in the policy file that indicates a reason why the policyholder may have elected to terminate the policy or let the policy lapse.

**Policy 894676647** was issued on July 3, 1989, with a face amount of $50,000.[438] The policy file includes inconsistent information related to when the policy lapsed. The policyholder

---

[429] TOWER036326-328.

[430] TOWER036347.

[431] TOWER036367-368; TOWER036373-374.

[432] TOWER028904-937, at TOWER028906.

[433] TOWER028901-903.

[434] TOWER028874-876; TOWER028877-883; TOWER028884-887; TOWER028892-897, at TOWER028892; TOWER028849-854, at TOWER028853.

[435] TOWER028901-903; TOWER028898-899.

[436] TOWER028856; TOWER028847.

[437] TOWER028890-891.

[438] TOWER029848-865, at TOWER029849.

**Confidential**

died in August 2013.[439] A notification of pending lapse was sent on February 3, 2014,[440] and the policy lapsed as of April 7, 2014.[441]

Tower sent the beneficiary a letter on June 7, 2019, to explain the appropriate process to claim a benefit, as well as follow up letters on July 19 and August 13, 2019.[442] The beneficiary spoke with Tower representatives related to claiming the death benefit around the same time and submitted a claim for benefit that was denied explaining that the policy no longer had value after May 3, 2013 (end of grace period).[443]

The policy file indicates that Tower had the wrong date of death on file and when this was corrected by the policyholder it made the claim invalid.[444]

Around the time the policy actually terminated, there is nothing in the policy file that indicates a reason why the policyholder may have elected to terminate the policy or let the policy lapse.

Finally, there is one example within the sample of the policyholder's beneficiaries disagreeing with Tower's method of notification. **Policy 864275599** was issued on January 24, 1986, with a face amount of $85,000.[445] Tower sent the policyholder multiple notifications of pending lapse because of missed premium payments.[446] The cash value of the policy eventually became insufficient to cover amounts due. A notification of pending lapse was sent on June 24, 2013[447] and the policy lapsed on September 23, 2013.[448] An attorney called on behalf of beneficiaries (policyholder's children) expressing that there was no phone call related to the pending notification of lapse, and that due to the policyholder's age he would have responded to a phone call as opposed to mail to keep the policy in force.[449] The beneficiaries complained

---

[439] TOWER029905; TOWER029900; TOWER029898.

[440] TOWER029869.

[441] TOWER029870-871.

[442] TOWER029872-882, at TOWER029872; TOWER029900-901; TOWER029902-903.

[443] TOWER029904; TOWER029906; TOWER029894; TOWER029907; TOWER029908.

[444] TOWER029909; TOWER029905; TOWER029894; TOWER029883-893, at TOWER029883; TOWER029907.

[445] TOWER025641-666, at TOWER025642.

[446] TOWER025802; TOWER025803; TOWER025804; TOWER025805; TOWER025808.

[447] TOWER025803.

[448] TOWER025806-807.

[449] TOWER025811.

Confidential

following the policyholder's death.[450] There is nothing in the record that indicates the policyholder did not receive the mailed notifications or that Tower had incorrect mailing instructions. Even in this instance, individual inquiry would be required of the beneficiaries to determine whether the Tower notifications were received by the policyholder.

Signed on the 6th Day of December of 2021 by:

_____

Craig Merrill, Ph.D.

---

[450] TOWER025753-799, at TOWER025765.

**Confidential**

# EXHIBIT 1

**CRA** Charles River
Associates

## Craig Merrill
Senior Consultant

PhD, Insurance and Finance
University of Pennsylvania

MA, Insurance and Finance
University of Pennsylvania

BA, Economics
Brigham Young University

Craig Merrill is the Second Mile Professor of Finance at Brigham Young University, where he has been a member of the faculty since 1993. Dr. Merrill has been Director of the MBA program and Chair of the Department of Finance at BYU Marriot. He has served as a Senior Consultant to CRA since 2006 and is a Fellow of the Wharton Financial Institutions Center.

Dr. Merrill teaches fixed income asset management, derivatives, and financial risk management in BYU's MBA and undergraduate finance programs. His research focuses primarily on fixed income securities and derivatives, asset-liability management, and applications of financial pricing to insurance liabilities.

Dr. Merrill's consulting assignments (AIG, Swiss Re, Goldman Sachs, The Hartford, Lazard Freres, Merrill Lynch, New York Life, Pacific Life, Winkelvoss & Associates, and others) have involved such projects as a two-factor bond pricing model, multi-asset return simulation models, intraday treasury security pricing, and the development of international interest-rate and exchange-rate simulation models. He has served as an expert witness in cases involving reinsurance, fixed and variable annuities, insurance pricing, cost of insurance, and 401(k) plans.

Dr. Merrill's work has been published in peer review journals such as the *Journal of Finance*, the *Journal of Risk and Insurance* and the *North American Actuarial Journal* from whom he received the award for best paper of 2002. Dr. Merrill has also presented his research at many prominent meetings and seminars throughout the United States.

## Academic experience

| | |
|---|---|
| 2019–Present | *Chair*, Department of Finance, BYU Marriott School |
| 2007–Present | *Professor*, Brigham Young University, Provo, UT |
| 2007–2013 | *Director*, Brigham Young University, Marriott MBA program |
| 2000–2007 | *Associate Professor*, Brigham Young University, Provo, UT |
| 1993–2000 | *Assistant Professor*, Brigham Young University, Provo, UT |
| 1997 | *Visiting Professor*, Georgia State University, Atlanta, GA |
| 1991–1993 | *Research Assistant*, University of Pennsylvania, Philadelphia, PA |
| 1988–1989 | *Instructor*, Brigham Young University, Provo, UT |

Charles River Associates

## Honors and awards

- Professorship, Second Mile Professor of Finance, 2014 – present

- Marriott School Citizenship Award – 2014

- Fellow, Wharton Financial Institutions Center, 2006 – present

- Marriott School Teaching Excellence Award – 2008

- Grant Taggart Fellow of Insurance, Risk Management and Financial Services, Brigham Young University, 1993 – 2008

- Best Paper of 2002, *North American Actuarial Journal*

- BYU Finance Society's Outstanding Professor Award for 2000 – 2001

- Graham and Dodd Award of Excellence, presented by the Association for Investment Management and Research in recognition of an outstanding feature article in the *Financial Analysts Journal,* 1998

- LECG Research Fellow, LECG, Inc. New York, NY, 1998

- Kemper Foundation Grant, Brigham Young University, 1997

- Huebner Foundation Fellowship, University of Pennsylvania, 1989 – 1993

- Rodney L. White Center Grant For Financial Research, 1991 – 1992

## Publications

"Were there Fire Sales in the RMBS Market?" With Taylor D. Nadauld, Rene M. Stulz, and Shane Sherlund, *Journal of Monetary Economics*, 2021, vol. 122, issue C, 17-37.

"Final Demand for Structured Finance Securities." With Taylor D. Nadauld and Philip E. Strahan, *Management Science*, 2017.

"Insurance Theory and Challenges Facing the Development of Microinsurance Markets." With James C. Brau and Kim Staking, *Journal of Developmental Entrepreneurship*, Vol 6(4), pp 411-440 (2011).

"The Relationship Between Corporate Social Responsibility and Shareholder Value: An Empirical Test of the Risk Management Hypothesis." With Paul Godfrey and Jared Hansen, *Strategic Management Journal*, 30:425-445 (2009).

"The U.S. Treasury Buyback Auctions: The Cost of Retiring Illiquid Bonds." With Bing Han and Francis Longstaff, *Journal of Finance*, Dec. 2007.

"Risky Loss Distributions and Modelling the Loss Reserve Pay-out Tail." With J. David Cummins and James B. McDonald, *Review of Applied Economics*, Vol. 3, No. 1, 2007.

"Real and Illusory Value Creation by Insurance Companies." With David F. Babbel, *Journal of Risk and Insurance*, March 2005. Lead article.

"The Effect of Transaction Size on Off-the-Run Treasury Prices." With David Babbel, Mark Meyer, and Meiring de Villiers, *Journal of Financial and Quantitative Analysis*, September 2004.

"Fair Value of Liabilities: The Financial Economics Perspective." With David Babbel and Jeremy Gold, *North American Actuarial Journal*, January 2002. Lead Article, Awarded best paper of 2002. (This article was also published as Chapter 1 in *Asset and Liability Management Tools: A Handbook for Best Practice,* edited by Bernd Sherer, Risk Books, London, 2003.)

"A Note on the Solution to a Three-Factor Affine Term Structure Model.: With Kabir Dutta, *Journal of Fixed Income*, December, 1999.

"Economic Valuation Models for Insurers." With David F. Babbel, *North American Actuarial Journal*, July 1998. Lead Article.

Discussion of "Two Paradigms for the Market Value of Liabilities." *North American Actuarial Journal*, October 1997.

A Response to "Time Diversification and Option Pricing Theory: Another Perspective" With Steven Thorley, *Journal of Portfolio Management*, Summer 1997.

"Default Risk and the Effective Duration of Bonds." With David F. Babbel and William Panning. *Financial Analysts Journal*, January / February 1997. Received a Graham and Dodd Award of Excellence. (This article was translated and published in the *Security Analysts Journal of Japan,* October 1998, Vol. 36, No 10.)

"Interest-Rate Option Pricing Revisited." With David Babbel. *Journal of Futures Markets*, December 1996, Vol. 16, No. 8.

"Teaching Interest Rate Contingent Claims Pricing." With David F. Babbel. A new pedagogical approach to teaching interest rate contingent claims pricing. *Journal of Financial Education*, Fall 1996. Lead article in peer review section of this journal.

"Time Diversification: Perspectives from Option Pricing." With Steven Thorley. Using option pricing methodology to evaluate risk in equity investments for different investment horizons. *Financial Analysts Journal*, May/June 1996. Lead article.

## Working papers

"Systemic Risk Between Insurers and Banks: A Generalized Event Study Approach." With Richard J. Butler and Gene Lai.

"Why did financial institutions sell RMBS at fire sale prices during the financial crisis?" With Taylor D. Nadauld, Rene M. Stulz, and Shane Sherlund.

## Other publications

"Investing Your Lump Sum at Retirement." Written with David F. Babbel, Wharton Financial Institutions Center, Policy Series, 2007.

"Fair Value of Liabilities: The Financial Economics Perspective." Written with David F. Babbel and Jeremy Gold, first chapter in *Asset and Liability Management Tools: A Handbook for Best Practice,* Risk Books, London, 2003.

"The Bullet GIC as an Example." Written with David Babbel and Jeremy Gold, *Risks and Rewards,* February 2001.

"Default Risk and Effective Duration." Presented at the AIMR seminar, Frontiers in Credit-Risk Analysis: A Fixed-Income Conference, and published in a proceedings book, 2000.

"The Ultimate Black Box." Written with David Babbel and Algis Remeza, presented at a New York University, Salomon Center conference and printed as a chapter in *Fair Value of Insurance Business,* 2000.

"Toward a Unified Valuation Model for Life Insurers." Written with David Babbel and published in *Changes in the Life Insurance Industry: Efficiency, Technology and Risk Management,* Kluwer, Norwell, MA, 1999.

*Valuing Interest-Sensitive Financial Instruments,* a technical monograph written with David F. Babbel, Frank Fabozzi Publishers, 1996. (Reviewed by a panel of investments experts.) This monograph has been designated as required reading for the Associate of the Society of Actuaries designation exams.

"Duration of Risky Bonds." With David Babbel and William Panning, presented at New York University, Salomon Center, and published as a chapter in *Financial Dynamics of the Insurance Industry,* Irwin, 1995. (Blind Conference Review). A slightly modified version of this paper was published as a working paper in the *Financial Sector Analysis Series,* World Bank, September, 1995.

"Generating Stochastic Interest Rate Scenarios." Invited presentation published in paper form in *The Record of the Society of Actuaries,* Vol. 21 No. 4, 1996.

"Option Pricing Mathematics." Invited presentation published in paper form in *The Record of the Society of Actuaries,* Vol. 21 No. 1, 1996.

## Presentations and seminars

"Systemic Network Risk in a Generalized Event Study Model," Risk Theory Seminar, April 2019.

"Why did financial institutions sell RMBS at fire sale prices during the financial crisis?" NBER and NYU, 2013. Also AFA, 2014.

"The Annuity Puzzle, Default Risk, and Social Security." BYU-Park City Conference, 2012.

"Optimal Decumulation: An Investment-Consumption Model for Retirees." With David Babbel and Jeffrey Humpherys, SIAM, 2012.

"Insurance Theory and Challenges Facing the Development of Microinsurance Markets." With James Brau and Kim Staking, Microinsurance conference, Senegal, 2009.

"Enterprise Risk Management." National Association of Corporate Directors Summit Conference, Deer Valley, Utah, 2009.

"Financial Engineering and Insurance Product Design." Society of Actuaries national meeting, Denver, Colorado, 2009.

"Life Insurance and Annuity Pricing: How Much Can Insurers Rely on Credit and Liquidity Risk Premiums?" Society of Actuaries national meeting, Denver, Colorado, 2009.

"Asset/Liability Management for Insurers." KPMG/Wharton Executive Education seminar, Wharton School, Philadelphia, 2002-2008.

"Quantitative Tools for Asset/Liability Management." Financial Risk Management Workshop, Milan, Italy, 2006.

"Advanced Asset/Liability Management for Life Insurers." Society of Actuaries and Wharton School, Philadelphia, 2001.

"Fair Value of Liabilities." Bowles Symposium, Georgia State University, Atlanta, 2001.

"New Thinking at the Business Schools: Financial Valuation of Insurance Liabilities." Presented at the investment actuaries symposium, 2000.

"A 3+N-Factor Model of the Term Structure of Interest, with Closed-Form Solutions." With D. Babbel and A. Remeza, presented at the American Risk and Insurance Association annual meeting, 2000.

"Financial Modeling Integration." Panel presentation at the Society of Actuaries Annual Meeting in San Diego, 2000.

"The Ultimate Black Box." Written with David Babbel and Algis Remeza, presented at the New York University, Salomon Center conference in Fair Value of Insurance Business, 1999.

"Economic Valuation of Insurance Liabilities." Presented in a plenary session of the American Risk and Insurance Association annual meetings, Vancouver, BC, 1999.

"Default Risk and Effective Duration." Presented at Frontiers in Credit-Risk analysis: A Fixed-Income Conference and sponsored by the AIMR in Chicago, 1999.

"Toward a Unified Valuation Model for Life Insurers." Written with David Babbel and presented at the New York University, Salomon Center conference Changes in the Life Insurance Industry: Efficiency, Technology and Risk Management, 1998.

"Financial Valuation of Insurance Liabilities." Presented to the Academy of Actuaries task force on fair valuation of liabilities, New York, 1998.

"Financial Risk Management." Presented at the American Risk and Insurance Association meetings in San Diego, 1997. Plenary session.

"Products Liability Loss Distributions and Liability Insurance Pricing." Presented at University of Minnesota, faculty seminar, 1996.

"Mathematics of Option Pricing." Presented at the Society of Actuaries meetings in Orlando, 1996. This was a day-long extension to the presentation in Boston, 1995.

"Generating Stochastic Interest Rate Scenarios." Member of panel at the Society of Actuaries meetings in Boston, 1995.

"Option Pricing Mathematics." Presented at the Society of Actuaries meetings in New Orleans, 1995.

"Duration of Risky Bonds." With David Babbel and William Panning, presented at New York University, Salomon Center, Financial Dynamics of the Insurance Industry, 1995.

"Optimal Social Security Pension Benefits With Heterogeneous Incomes." With Paul D. Thistle, presented at the Southern Economic Association meeting, Orlando FL., 1994.

"Heterogeneous Incomes and the Design of Social Security Programs." With Paul D. Thistle, presented at the American Risk and Insurance Association meetings, Washington D.C., 1992 and at a Georgia State University Faculty Seminar, 1994.

"Moonlighting and Deductibles: A Market-based Solution to the Problem of Insurance Contract Purchase Non-Observability." Presented at the American Risk and Insurance Association meetings, Washington D.C., 1992 and at a Brigham Young University, Faculty Seminar, 1993.

## Professional services

### Committee assignments

- American Academy of Actuaries task force on fair value of liabilities, 1999 – 2001
- Awards Committee of the American Risk and Insurance Association, 1998 – 2001
- Les B. Strickler Innovation in Teaching Award Committee, American Risk and Insurance Association, 2000.
- Strategy Committee of the American Risk and Insurance Association, 1998 – 99
- Program Committee of the American Risk and Insurance Association, 1998 – 99
- Chairman, Insurance, Risk Management and Financial Services Faculty Committee, Brigham Young University, 1993 – Present
- Joint SoA/CAS Working Group on Course 2, Society of Actuaries, 1996
- Program Committee, Financial Management Association, 1995 – 96
- Program Committee, Financial Management Association, 1994 – 95
- Journal and Awards Committee, American Risk and Insurance Association, 1994 – 95
- Program Committee, American Risk and Insurance Association, 1994 – 95

### Discussant

American Finance Association, 1996: Francisco Delgado, Optimal Exercise of Call Provision on Bonds

American Risk and Insurance Association, 1995: Moderator of Plenary Session on Corporate Risk Management

American Risk and Insurance Association, 1994: David Cummins and David Sommer, Prices, Capital, and Risk in Property-Liability Insurance Markets

Charles River Associates

Financial Management Association, 1994: Arthur Hogan and Samuel Cox, Life Insurer Risk-Based Capital: An Option Theoretic Approach

Financial Management Association, 1994: Duane Stock and John Hu, The Impact of Junior Debt Upon the Systematic Risk of Senior Debt

Financial Management Association, 1994: Duane Stock, Par Coupon Yield Curves for Callable Bonds and Amortizing Instruments

### Reviewer

- *Management Science*
- *Journal of Banking*
- *Journal of Risk and Insurance*
- *Journal of Futures Markets*
- *North American Actuarial Journal*
- *The Financial Review*

## Areas of interest

### Research

- Fixed income securities and derivatives
- Asset-liability management
- Applications of financial pricing to insurance liabilities

### Teaching

- Finance risk management and derivatives
- Fixed income analysis

### Professional affiliations

- American Finance Association
- American Risk and Insurance Association
- Risk and Insurance Management Society

# EXHIBIT 2



**Craig Merrill**
Senior Consultant

PhD, Insurance and Finance
University of Pennsylvania

MA, Insurance and Finance
University of Pennsylvania

BA, Economics
Brigham Young University

## Testimony of Professor Craig Merrill since January 1, 2017

- Submitted a report, was deposed and testified at arbitration in the matter of Franklin Raines v. Federal National Mortgage Association ("Fannie Mae"), concerning the decision made by Fannie Mae to stop Mr. Raines monthly lifetime retirement payment and replace it with a lump-sum settlement.  This testimony included a discussion of the benefits of lifetime income as well as perspective on the cost to provide lifetime income versus the economic value it provides to an individual.  (*American Arbitration Association, Case No. 01-16-003-7097, 2016-17.*)

- Submitted a report and was deposed in connection with the arbitration between Ability Insurance Company and American Family Life Insurance Company regarding a reinsurance treaty covering long-term care insurance contracts.  I was asked by counsel for Ability to review certain elements of the reinsurance contract focused on the management of the asset portfolio and respond to positions taken by American Family and its experts.  (*No arbitration case number available, 2016-17.*)

- Submitted three reports, was deposed twice, and testified at trial in connection with Frederick Rozo, individually and on behalf of all others similarly situated, v. Principal Life Insurance Company. I was asked by counsel for Principal Life Insurance Company to comment on issues relating to a fixed income product offered by Principal Life Insurance Company.  In addition, I was asked to review and respond to the report provided by Plaintiff's expert.  (*U.S.D.C., Southern District of Iowa, Case No. 4:14-cv-00463, 2016-17.*)

- Submitted a report and was deposed in the matter of Todd Wolff v. Allianz Life Insurance Company of North America and Robert McGarvey, concerning features of a deferred annuity product.  I was asked by counsel for Allianz Life to review and respond to the opinions of plaintiff's experts and fact expert witness.  (*Montana First Judicial District Court, Lewis and Clark County, Case No. BDV-2016-9, Hon. James P. Reynolds, 2017-18*)

- Submitted a report and was deposed in the matter of Richard Dickman and Kent Alderson, individually and on behalf of all others similarly situated, v. Banner Life Insurance Company.  I was asked by counsel for Banner Life Insurance Company to comment on issues related to cost of insurance charges on universal life insurance policies.  In addition, I was asked to review and respond to reports provided by Plaintiffs' experts. (*U.S.D.C., Southern District of Maryland, Case No. 1:16-cv-00192, 2018.*)

- Submitted two reports and was deposed in the matter of EFG Bank AG, Cayman Branch *et al.* v. Transamerica Life Insurance Company.  I was asked by counsel for Transamerica Life Insurance Company to comment on issues related to cost of insurance charges on universal life insurance policies.  In addition, I was asked to review and respond to a report provided by Plaintiffs' experts. (*U.S.D.C., Central District of California, Case No. 2:16-cv-08104-CAS-GJSx.*)

- Submitted two reports and was deposed in the matter of The Wolf 2005, LLC v. Transamerica Life Insurance Company.  I was asked by counsel for Transamerica Life Insurance Company to comment on issues related to cost of insurance charges on universal life insurance policies.  In addition, I was asked to review and respond to a report provided by Plaintiff's experts. (*U.S.D.C., Central District of California, Case No. 2:17-cv-00994-CAS-GJSx.*)

- Submitted two reports and was deposed in the matter of LSH CO *et al.* v. Transamerica Life Insurance Company.  I was asked by counsel for Transamerica Life Insurance Company to comment on issues related to cost of insurance charges on universal life insurance policies.  In addition, I was asked to review and respond to reports provided by Plaintiffs' experts. (*U.S.D.C., Central District of California, Case No. 2: 18-cv-09711-CAS-KSx.*)

- Submitted a report and was deposed in the matter of Vida Longevity Fund, LP vs. Lincoln Life & Annuity Company of New York.  I was asked by counsel for Lincoln Life & Annuity Company of New York to comment on issues related to the cost of insurance charges on universal life insurance policies.  In addition, I was asked to review and respond to reports submitted by experts for the Plaintiff. (*U.S.D.C., Southern District of New York, Case No. 19-cv-6004.*)

# EXHIBIT 3

Confidential

**Exhibit 3**
**Documents Considered**

**Case Filings**

Plaintiff Susan A. Pitt's Notion of Motion and Motion for Class Certification, October 21, 2021.

Defendant Metropolitan Tower Life Insurance Company's Supplemental Responses and Objections to Plaintiff's Interrogatories, dated January 15, 2021.

Defendant Metropolitan Tower Life Insurance Company's Responses and Objections to Plaintiff's Interrogatories, [Set Three], dated January 15, 2021.

Defendant Metropolitan Tower Life Insurance Company's Supplemental Responses and Objections to Plaintiff's Interrogatories, [Set Two], dated March 1, 2021.

Defendant Metropolitan Tower Life Insurance Company's Second Supplemental Responses and Objections to Plaintiff's Interrogatories, dated March 31, 2020.

Defendant Metropolitan Tower Life Insurance Company's Responses and Objections to Plaintiff's Interrogatories, [Set Four], dated May 18, 2021.

Defendant Metropolitan Tower Life Insurance Company's Second Supplemental Responses and Objections to Plaintiff's Interrogatories, [Set Two], July 9, 2021.

Declaration of Kathryn Kurtz in Support of Defendant's Motion for Summary Judgment, December 6, 2021.

Declaration of Deborah O'Donnell in Opposition to Class Certification, December 2, 2021.

Susan A. Pitt, Individually, as Successor-In-Interest to Michael A. Pitt, Decedent, on Behalf of the Estate of Michael A. Pitt, and on Behalf of the Class, v. Metropolitan Tower Life Insurance Company, Class Action Complaint, April 9, 2020.

**Bates Stamped Documents**

TOWER023801 – TOWER038170 – Policy File Productions

Exhibit 6 includes redacted copies of all individual policy file documents referenced in this report.

**Publicly Available Research and Information**

Bauer, Daniel; Gao, Jin; Moenig, Thorsten; Ulm, Eric R.; and Zhu, Nan, "Policyholder Exercise Behavior in Life Insurance: The State of Affairs" (2015). Risk Management and Insurance Faculty Publications. Paper 1, page 12. Accessible at http://scholarworks.gsu.edu/rmi_facpub/1.

Aisling Bradfield, Carolyn Covington, Rebecca Reppert, and Julien Tomas, U.S. Post-Level Term Lapse & Mortality Experience, Society of Actuaries, May 2021.

**Confidential**

**Exhibit 3**
**Documents Considered**

Deloitte, "Life insurance consumer purchase behavior, Tailoring consumer engagement for today's middle market," September 2015.

Martin Eling and Michael Kochanski, *Research on Lapse in Life Insurance – What Has Been Done and what Needs to Be Done*, Institute of Insurance Economics, University of St. Gallen Working Papers on Risk Management and Insurance No. 126, December 2012.

Hanming Fang and Edward Kung, Why Do Life Insurance Policy Holders Lapse? The Roles of Income, Health and Bequest Motive Shocks, NBER Working Paper Series, Working Paper 17899, March 2012.

Ken Qian, Ben Johnson, and Jenny Jin, MIMSAIII 2020: Study of mortality and lapse rates in level term life insurance, Milliman Research Report, 2020.

Anthony M. Santomero and David F. Babbel, Financial Markets, Instruments & Institutions, 2nd Ed., McGraw-Hill Irwin, 2001.

Maureen Shaughnessy and Kevin Tewksbury, U.S. Individual Life Insurance Persistency, A Joint Study Sponsored by the Society of Actuaries and LIMRA, 2019.

**Confidential**

# EXHIBIT 4

Confidential

**Exhibit 4**
**Level Term Policies - Lapsed Following GLT Period**

| Sample # | | Policy Number | Face Amount | Policy Type | Product Code | Issue Date [a] | Paid-To-Date [b] | Years Inforce [c] | Lapse Date | Lapse Days | Term Premium | Post-Term Premium | Percent Increase |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | [1] | 3337510 | $200,000 | TERM-LIFE | LT-20 | 10/23/1996 | 10/23/2016 | 20 | 1/3/2017 | 72 | $ 3,835 | $ 27,157 | 608% |
| 2 | [2] | 3346650 | $1,500,000 | TERM-LIFE | LT-20 | 4/9/1997 | 4/9/2017 | 20 | 6/14/2017 | 66 | $ 11,955 | $ 125,850 | 953% |
| 3 | [3] | 3349016 | $250,000 | TERM-LIFE | LT-20 | 7/15/1997 | 7/15/2017 | 20 | 9/19/2017 | 66 | $ 830 | $ 7,457 | 798% |
| 4 | [4] | 3350597 | $700,000 | TERM-LIFE | LT-20 | 7/23/1997 | 7/23/2017 | 20 | 9/26/2017 | 65 | $ 6,116 | $ 64,265 | 951% |
| 5 | [5] | 3359545 | $200,000 | TERM-LIFE | LT-20 | 2/28/1998 | 2/28/2018 | 20 | 5/4/2018 | 65 | $ 353 | $ 3,025 | 757% |
| 6 | [6] | 3359662 | $500,000 | TERM-LIFE | LT-20 | 2/27/1998 | 2/27/2018 | 20 | 5/3/2018 | 65 | $ 705 | $ 6,810 | 866% |
| 7 | [7] | 3363329 | $100,000 | TERM-LIFE | LT-20 | 6/11/1998 | 6/11/2018 | 20 | 10/3/2018 | 114 | $ 538 | $ 7,768 | 1344% |
| 8 | [8] | 3341095 | $170,000 | TERM-LIFE | LT-20 | 1/1/1997 | 2/1/2017 | 20 | 4/7/2017 | 65 | $ 413 | $ 4,158 | 906% |
| 9 | [9] | 3341611 | $300,000 | TERM-LIFE | LT-20 | 1/7/1997 | 1/7/2017 | 20 | 3/13/2017 | 65 | $ 1,443 | $ 13,824 | 858% |
| 10 | [10] | 3360579 | $900,000 | TERM-LIFE | LT-20 | 5/1/1998 | 5/1/2018 | 20 | 7/5/2018 | 65 | $ 1,002 | $ 9,057 | 804% |
| 11 | [11] | 3362197 | $150,000 | TERM-LIFE | LT-20 | 5/7/1998 | 5/7/2018 | 20 | 7/11/2018 | 65 | $ 204 | $ 1,466 | 618% |
| 12 | [12] | 3367628 | $300,000 | TERM-LIFE | LT-20 | 10/15/1998 | 10/15/2018 | 20 | 12/19/2018 | 65 | $ 477 | $ 3,663 | 668% |
| 13 | [13] | 3372067 | $400,000 | TERM-LIFE | LT-20 | 3/18/1999 | 3/18/2019 | 20 | 5/22/2019 | 65 | $ 1,995 | $ 20,599 | 933% |
| 14 | [14] | 3923220 | $250,000 | TERM-LIFE | LT-20 | 9/27/1996 | 9/27/2016 | 20 | 12/2/2016 | 66 | $ 278 | $ 2,255 | 713% |
| 15 | [15] | 3923770 | $100,000 | TERM-LIFE | LT-20 | 2/3/1998 | 2/3/2018 | 20 | 4/9/2018 | 65 | $ 189 | $ 1,311 | 594% |
| 16 | [16] | 3415184 | $100,000 | TERM-LIFE | GLT-10 | 2/1/2003 | 2/1/2013 | 10 | 4/8/2013 | 66 | $ 2,229 | $ 17,817 | 699% |
| 17 | [17] | 3415708 | $150,000 | TERM-LIFE | GLT-10 | 2/20/2003 | 2/20/2013 | 10 | 4/26/2013 | 65 | $ 326 | $ 2,284 | 600% |
| 18 | [18] | 3419743 | $500,000 | TERM-LIFE | GLT-10 | 4/19/2003 | 4/19/2013 | 10 | 6/24/2013 | 66 | $ 2,620 | $ 46,345 | 1669% |
| 19 | [19] | 3424108 | $1,500,000 | TERM-LIFE | GLT-10 | 12/26/2003 | 12/26/2013 | 10 | 3/3/2014 | 67 | $ 3,375 | $ 73,005 | 2063% |
| 20 | [20] | 3424506 | $250,000 | TERM-LIFE | GLT-10 | 4/28/2004 | 4/28/2014 | 10 | 7/2/2014 | 65 | $ 518 | $ 9,915 | 1816% |
| 21 | [21] | 3710207 | $500,000 | TERM-LIFE | GLT-10 | 7/1/2003 | 7/1/2013 | 10 | 9/4/2013 | 65 | $ 750 | $ 6,970 | 829% |
| 22 | [22] | 3710213 | $500,000 | TERM-LIFE | GLT-10 | 7/1/2003 | 7/1/2013 | 10 | 9/4/2013 | 65 | $ 7,595 | $ 64,420 | 748% |
| 23 | [23] | 3749600 | $250,000 | TERM-LIFE | GLT-10 | 12/18/2003 | 12/18/2013 | 10 | 2/21/2014 | 65 | $ 1,665 | $ 20,625 | 1139% |
| 24 | [24] | 3848022 | $1,000,000 | TERM-LIFE | GLT-10 | 8/18/2003 | 8/18/2013 | 10 | 10/22/2013 | 65 | $ 3,460 | $ 59,710 | 1626% |
| 25 | [25] | 3855294 | $250,000 | TERM-LIFE | GLT-10 | 11/14/2003 | 11/14/2013 | 10 | 1/21/2014 | 68 | $ 145 | $ 1,170 | 707% |
| 26 | [26] | 3404898 | $250,000 | TERM-LIFE | GLT-10 | 5/13/2002 | 5/13/2012 | 10 | 7/17/2012 | 65 | $ 1,183 | $ 26,005 | 2099% |
| 27 | [27] | 3411701 | $1,000,000 | TERM-LIFE | GLT-10 | 11/2/2002 | 11/2/2012 | 10 | 1/7/2013 | 66 | $ 1,640 | $ 16,980 | 935% |
| 28 | [28] | 3413782 | $1,260,000 | TERM-LIFE | GLT-10 | 12/5/2002 | 12/5/2012 | 10 | 2/8/2013 | 65 | $ 3,240 | $ 55,228 | 1605% |
| 29 | [29] | 3812421 | $250,000 | TERM-LIFE | GLT-10 | 10/1/2002 | 10/1/2012 | 10 | 12/5/2012 | 65 | $ 280 | $ 4,540 | 1521% |
| 30 | [30] | 3815705 | $100,000 | TERM-LIFE | GLT-10 | 8/1/2002 | 8/1/2012 | 10 | 10/5/2012 | 65 | $ 435 | $ 6,514 | 1397% |
| 31 | [31] | 3827550 | $500,000 | TERM-LIFE | GLT-10 | 11/18/2002 | 11/18/2012 | 10 | 1/22/2013 | 65 | $ 550 | $ 4,690 | 753% |
| 32 | [32] | 3856868 | $500,000 | TERM-LIFE | GLT-10 | 1/15/2004 | 3/15/2014 | 10 | 5/19/2014 | 65 | $ 310 | $ 3,350 | 981% |
| 33 | [33] | 3865241 | $800,000 | TERM-LIFE | GLT-10 | 12/2/2004 | 12/2/2014 | 10 | 2/5/2015 | 65 | $ 418 | $ 4,890 | 1070% |

| Average Premium Increase Across 33 Policies | 1049% |
|---|---|

**Exhibit 4**
**Level Term Policies - Lapsed Following GLT Period**

**Sources**

| | |
|---|---|
| [1] | TOWER026815-845; TOWER026808-810. |
| [2] | TOWER027007-031; TOWER027096; TOWER027000-001. |
| [3] | TOWER027145-173; TOWER027305; TOWER027099-100. |
| [4] | TOWER024414-441; TOWER024409-411. |
| [5] | TOWER027363-388; TOWER027358-360. |
| [6] | TOWER024541-568; TOWER024536-538. |
| [7] | TOWER024756-781; TOWER024729-731. |
| [8] | TOWER031644-674; TOWER031637-639. |
| [9] | TOWER031802-828; TOWER031774-776. |
| [10] | TOWER032311-336; TOWER032306-308. |
| [11] | TOWER032620-645; TOWER032616-618. |
| [12] | TOWER032815-846; TOWER032786-788. |
| [13] | TOWER033012-039; TOWER032981-983. |
| [14] | TOWER034332-364; TOWER034440; TOWER034384-385. |
| [15] | TOWER034455-489; TOWER034444-446. |
| [16] | TOWER027545-561; TOWER027540-542. |
| [17] | TOWER027605-627; TOWER027602-604. |
| [18] | TOWER024801-826; TOWER024785-787. |
| [19] | TOWER024880-907; TOWER024870-872. |
| [20] | TOWER024950-969; TOWER024944-946. |
| [21] | TOWER027671-673, TOWER027702-706. |
| [22] | TOWER025130-132; TOWER025254-258. |
| [23] | TOWER025278-280; TOWER025306-310. |
| [24] | TOWER027868-891; TOWER027847-849. |
| [25] | TOWER027934-954; TOWER027924-926. |
| [26] | TOWER033315-329; TOWER033310-312. |
| [27] | TOWER033381-339; TOWER033377-379. |
| [28] | TOWER033432-033451; TOWER033426-428. |
| [29] | TOWER033897-911; TOWER033889-891. |
| [30] | TOWER034000-018; TOWER033988-990. |
| [31] | TOWER034058-034077; TOWER034050-052. |
| [32] | TOWER034118-137; TOWER034107-109. |
| [33] | TOWER034221-241; TOWER034212-214. |

Confidential

# EXHIBIT 5

Confidential

**Exhibit 5**
**Document Generation Dates For Certain Tower Notices**

There are a number of notices within the policy files that do not include the date the document was generated on the face of the document itself.  Consistent with the Declaration of Kathryn Kurtz,[1] one must look to the original file name of these notices in Tower's system in order to determine the date on which Tower generated the notice.  The table below includes all of the documents listed as references in my report that require a review of the original file name in order to confirm the date on which a notice was generated.

| Policy | Bates Stamp | Document Generation Date |
|--------|-------------|--------------------------|
| 3361929 | TOWER032525-526 | March 18, 2019 |
| 3710095 | TOWER0033881-884 | December 21, 2012 |
| 3358711 | TOWER032279-282 | December 9, 2019 |
| 3358711 | TOWER032084 | January 27, 2020 |
| 3287297 | TOWER031573-574 | July 20, 2015 |
| 3287297 | TOWER031561-562 | July 19, 2016 |
| 3287297 | TOWER031601-602 | September 12, 2016 |
| 3067590 | TOWER0031254-055 | April 24, 2014 |
| 3067590 | TOWER0031252-053 | April 24, 2014 |
| 840387456 | TOWER025586 | August 21, 2018 |
| 894377545 | TOWER029738 | January 2, 2013 |
| 894377545 | TOWER029740 | February 1, 2013 |
| 894377545 | TOWER029742 | March 1, 2013 |
| 890815239 | TOWER036155 | September 28, 2015 |
| 890815239 | TOWER036156 | November 30, 2015 |
| 885176039 | TOWER036080 | July 15, 2020 |
| 885176039 | TOWER036081 | August 3, 2020 |
| 885176039 | TOWER036082 | September 1, 2020 |
| 3938209 | TOWER028202-205 | January 29, 2015 |
| 3938209 | TOWER028221-224 | March 24, 2014 |
| 3938209 | TOWER028464-469 | June 22, 2015 |
| 854675664 | TOWER029323 | November 28, 2016 |
| 3607562 | TOWER033798-799 | October 8, 2018 |
| 3607562 | TOWER033838-839 | November 29, 2018 |
| 3607562 | TOWER033841-844 | November 29, 2018 |
| 3298494 | TOWER026743 | August 9, 2016 |
| 864375402 | TOWER0025985 | March 4, 2019 |
| 864375402 | TOWER0025991 | April 3, 2019 |
| 864375402 | TOWER0025997 | May 15, 2019 |
| 894776924 | TOWER029952 | October 14, 2015 |

---

[1] Declaration of Kathryn Kurtz in Support of Defendant's Motion for Summary Judgment, December 6, 2021, ¶¶ 14-15, p. 3.

1

Confidential

**Exhibit 5**
**Document Generation Dates For Certain Tower Notices**

| Policy | Bates Stamp | Document Generation Date |
|--------|-------------|--------------------------|
| 841177330 | TOWER034699 | April 3, 2012 |
| 841177330 | TOWER034723 | October 3, 2016 |
| 895176152 | TOWER036325 | December 16, 2013 |
| 855075325 | TOWER029454 | May 21, 2018 |
| 855075325 | TOWER029465 | June 11, 2018 |
| 855075325 | TOWER029480 | July 11, 2018 |
| 855075325 | TOWER0029494-495 | August 16, 2018 |
| 844886021 | TOWER0029108 | March 27, 2017 |
| 835285292 | TOWER0025514 | February 3, 2012 |
| 835285292 | TOWER0025516-517 | March 29, 2012 |
| 835285292 | TOWER0025520 | June 4, 2012 |
| 835285292 | TOWER0025523 | November 5, 2012 |
| 835285292 | TOWER0025515 | March 4, 2013 |
| 894177313 | TOWER026334 | December 7, 2015 |
| 894275882 | TOWER029729 | August 15, 2014 |
| 106013447 | TOWER030227-229 | March 15, 2013 |
| 106123626 | TOWER030353-355 | December 2, 2013 |
| 845175548 | TOWER029216 | October 20, 2014 |
| 845176371 | TOWER029223 | February 26, 2018 |
| 862146637 | TOWER025634 | November 24, 2014 |
| 884476998 | TOWER029686 | January 26, 2015 |
| 106213707 | TOWER030527-529 | September 20, 2017 |
| 106216761 | TOWER030710-711 | October 6, 2016 |
| 106216761 | TOWER030712-715 | October 6, 2016 |
| 106768896 | TOWER031042-043 | April 28, 2016 |
| 834455063 | TOWER034610 | January 16, 2018 |
| 854576241 | TOWER029287 | February 15, 2013 |
| 875215276 | TOWER035881 | February 26, 2018 |
| 3423563 | TOWER033633-634 | December 4, 2013 |
| 895275662 | TOWER036387 | January 14, 2019 |
| 894676647 | TOWER029869 | February 3, 2014 |
| 864275599 | TOWER025803 | June 24, 2013 |

Confidential

# EXHIBIT 6

**Produced  Electronically**

Confidential